AMERICAN RIO GRANDE LAND & IRRIGATION CO. v. MERCEDES PLANTATION CO.

(Court of Civil Appeals of Texas. San Antonio. Feb. 26, 1913. On Motion for Rehearing, March 26, 1913.)

1. APPEAL AND ERROR (§ 282*)—MOTION FOR NEW TRIAL—NECESSITY.

Under rule 71a (145 S. W. xii), making a motion for a new trial a prerequisite to an appeal unless the error complained of is fundamental, except in cases where the statute does not require such motion, and Rev. St. 1895, art. 1333, as amended by Acts 26th Leg. c. 111, providing that no motion for new trial need be filed where the conclusions of fact found by the judge are separately stated, assignments of error were reviewable in a case wherein the court on request filed separate conclusions of fact and law, though no motion for new trial was filed below.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1662–1665; Dec. Dig. § 282.*]

2. EVIDENCE (§ 442*)—PAROL EVIDENCE—ADMISSIBILITY.

Where persons enter into a contract which is entirely verbal and a part only is subsequently reduced to writing, parol evidence as to such part is admissible, not to vary the writing, but to show the original contract in its entirety.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1874–1899; Dec. Dig. § 442.*]

3. FRAUDS, STATUTE OF (§ 72*) — CONTRACT FOR WATER RIGHTS—SALE OF LAND.

A verbal contract for the sale of a permanent water right is not void under the statute of frauds as being a contract concerning the sale of land.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 116–118; Dec. Dig. § 72.*]

4. WATERS AND WATER COURSES (§ 254*)—IRRIGATION COMPANY—VALIDITY OF CONTRACT.

An irrigation company chartered under Acts 24th Leg. c. 21, § 11 (Rev. Civ. St. 1911, art. 5002), being a quasi public corporation, owed a duty to supply water to land contiguous to its canals without a contract therefor, and the only matters open to verbal contract with reference to the water were the price and terms upon which, and the time at which, it would be delivered.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 311; Dec. Dig. § 254.*]

5. VENDOR AND PURCHASER (§ 53*)—VERBAL SALE—CONTRACT OF SALE.

Where the vendor and the purchaser agree as to the price, terms, and the specific property, and the purchaser pays a portion of the purchase price and takes possession and makes valuable improvements, the transaction constitutes an executed verbal sale of the land, and not a mere executory contract of sale.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. § 84; Dec. Dig. § 53.*]

6. CORPORATIONS (§ 410*) — AUTHORITY OF AGENT—SALE OF LAND.

Where the general manager and sales agent of an incorporated land company sold land of the company without authority to do so, though under circumstances from which the purchaser assumed that they had such authority, neither the sale of the land nor agreements leading up thereto were binding upon the corporation, unless ratified.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1629–1632; Dec. Dig. § 410.*]

7. CORPORATIONS (§ 426*) — CONTRACTS OF AGENT—RATIFICATION—ESTOPPEL.

Where an incorporated land company, with full knowledge of the facts, ratifies and adopts as its own an unauthorized sale of land by its agent, it is estopped to deny the agent's authority; but it cannot be held to have adopted acts of its agent of which it is ignorant.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1596, 1702–1704, 1707, 1708, 1710–1716; Dec. Dig. § 426.*]

8. CORPORATIONS (§ 432*) — AUTHORITY OF AGENT—IRRIGATION COMPANY—EVIDENCE—SUFFICIENCY.

Evidence, in an action against an irrigation company for damages from failure to furnish water at the time promised by its agent who sold the land to plaintiff, held insufficient to show that the agent was authorized to contract

to deliver water at a designated time, or to show that the company had such knowledge of the contract as rendered the subsequent execution of a deed to the purchaser a ratification of it.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1717, 1718, 1724, 1726–1737, 1743, 1762; Dec. Dig. § 432.*]

9. CORPORATIONS (§ 425*)—IRRIGATION COMPANY—UNAUTHORIZED CONTRACT BY AGENT—NOTICE.

That an incorporated irrigation company supplied water at the price and upon the terms specified in an unauthorized verbal contract executed by its agent and collected the money therefor did not charge the company with notice of the contract and estop it from denying the authority of its agent.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1697–1701, 1705; Dec. Dig. § 425.*]

10. WATERS AND WATER COURSES (§ 254*)—IRRIGATION—DUTY TO SUPPLY WATER.

An incorporated irrigation company, being a quasi public corporation, owed the owner of land contiguous to its canals the duty to provide water for irrigating such land upon reasonable notice from the landowner, and upon reasonable terms, and within its ability to supply the same by the exercise of reasonable diligence.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 311; Dec. Dig. § 254.*]

11. WATERS AND WATER COURSES (§ 263*)—IRRIGATION—NOTICE OF SPECIAL DAMAGES.

A notice to an irrigation company by a plantation company entitled to be supplied with water that its water supply had been cut off, leaving it about "20,000 cabbage plants pulled" which would be a total loss unless it got water at once, was sufficient notice that if water was not supplied at once it would be unable to transplant the 20,000 cabbage plants, and was sufficient to charge the irrigation company with notice of all special damages naturally growing out of such loss.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 324; Dec. Dig. § 263.*]

12. WATERS AND WATER COURSES (§ 263*)—MEASURE OF DAMAGES—"GROWING CROP."

The measure of damages for the destruction of cabbage plants designed to be transplanted to a 25-acre tract of land, through failure to furnish water to irrigate such tract, was the value of the probable yield under proper cultivation when mature and ready for sale, less the expense of such cultivation and the cost of marketing; the cabbage plants, though not transplanted, constituting a "growing crop."

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 324; Dec. Dig. § 263.*

For other definitions, see Words and Phrases, vol. 4, pp. 3177, 3178.]

13. APPEAL AND ERROR (§ 1011*)—FINDINGS—CONFLICTING EVIDENCE.

In an action for the destruction of a growing crop through failure to furnish water for irrigation, findings on conflicting evidence could not be disturbed on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3983–3989; Dec. Dig. § 1011.*]

14. DAMAGES (§ 62*)—IRRIGATION—DESTRUCTION OF CROP—MITIGATION OF DAMAGES.

Where an irrigation company's failure to furnish water at the proper time caused the destruction of cabbage plants, the rule requiring the injured person to mitigate his damages

required merely that he make reasonably diligent inquiry in the vicinity for other plants and did not require that he seek plants elsewhere.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 119–132; Dec. Dig. § 62.*]

15. WATERS AND WATER COURSES (§ 263*)—IRRIGATION—ACTION FOR DAMAGES—PETITION—SUFFICIENCY.

Where a corporation organized under the irrigation statutes contracted to sell water to plaintiff, who was entitled to receive the same, plaintiff's petition, in an action against the company for negligent failure to furnish water according to its contract, was not insufficient for failure to allege that the corporation had a superior right to appropriate the water; the corporation being in no position to require such an allegation.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 324; Dec. Dig. § 263.*]

16. EVIDENCE (§ 183*)—SECONDARY EVIDENCE—CERTIFIED COPY—AFFIDAVIT OF LOSS.

In an action against an irrigation company for damages from failure to furnish water, it was error to admit a certified copy of its declaration of intention to appropriate the water, which instrument is one required by law to be acknowledged and recorded, where the same was not filed three days before the commencement of the trial and no affidavit was filed alleging the loss of the original instrument as required by Rev. Civ. St. 1911, art. 3700.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 605–637; Dec. Dig. § 183.*]

17. APPEAL AND ERROR (§ 1170*)—GROUND FOR REVERSAL—ADMISSION OF EVIDENCE.

Under the express terms of rule 62a (149 S. W. x) of the Court of Civil Appeals, the improper admission in evidence of a certified copy of an instrument was not ground for reversal, where it was not denied that such instrument was filed and recorded, or that the copy introduced was correct.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4540–4545; Dec. Dig. § 1170.*]

18. WATERS AND WATER COURSES (§ 232*)—IRRIGATION—QUASI PUBLIC CORPORATION.

Where an irrigation company acquired under the irrigation statutes superior rights to use waters of a river, it became a quasi public corporation chargeable as such with the duty of fairly and impartially furnishing water at a reasonable charge to the land contiguous to its canals, although an ancient grant to its vendors vested in them the riparian rights to the waters of such river.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 321, 322; Dec. Dig. § 232.*]

19. WATERS AND WATER COURSES (§ 261*)—IRRIGATION — CONTRACT — LIMITATION OF LIABILITY.

A provision of a contract of an irrigation company chargeable with the duties of a quasi public corporation to furnish water to land adjacent to its irrigation canals, that it should not be liable for more than $10 per acre for negligent failure to supply water, was void.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 261.*]

20. WATERS AND WATER COURSES (§ 263*)—IRRIGATION—ACTION FOR DAMAGES—PETITION.

In an action against an irrigation company for failure to furnish water in accordance with a contract which required the plaintiff to make written application for water, allegations of the petition that plaintiff made a written appli-

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

cation on a certain date, and defendant informed plaintiff that it had no water to furnish, and that therefore, because plaintiff knew no water could be had, it made no further written application therefor, were sufficient to put in issue the sufficiency of notice and fairly raised the question of plaintiff's justification in failing to continue making demand.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 324; Dec. Dig. § 263.*]

21. WATERS AND WATER COURSES (§ 261*)— IRRIGATION—REPETITION OF DEMAND.

In order to entitle a plantation company to recover damages from an irrigation company for failure to furnish water as it had contracted to do, it was not essential that the plantation company continually repeat a request for water which it knew could not be supplied.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 261.*]

22. WATERS AND WATER COURSES (§ 261*)— IRRIGATION—DEMAND FOR WATER.

Where a plantation company entitled to be supplied with water by an irrigation company makes a demand therefor, it is bound by the language of such demand, though the demand be not required.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 261.*]

23. WATERS AND WATER COURSES (§ 263*)— IRRIGATION—DESTRUCTION OF CROPS—DAMAGES.

The damages recoverable for the destruction of the crop of cabbage should have been measured by the average price from the date of the destruction to the date when it would have been harvested.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 324; Dec. Dig. § 263.*]

24. APPEAL AND ERROR (§ 1033*)—HARMLESS ERROR—MEASURE OF DAMAGES.

An error of the court in adopting an erroneous measure of damages is harmless, where no measure more favorable to the appellant could have been adopted.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4052–4062; Dec. Dig. § 1033.*]

25. APPEAL AND ERROR (§ 1050*)—HARMLESS ERROR—ADMISSION OF EVIDENCE.

In an action for the destruction of a crop of certain products, the erroneous admission of evidence of the market value of such products was harmless, where there was competent evidence from which the court could have reached the same correct conclusions.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4153–4160, 4166; Dec. Dig. § 1050.*]

26. DAMAGES (§ 174*)—DESTRUCTION OF CROP—EVIDENCE.

In an action for damages for the destruction of crops of certain products, it was not error to permit a witness to testify that of the products raised some were sold at the nearest shipping point and others were shipped to market, but that all were sold on a basis of f. o. b. at the nearest shipping point.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 462, 467; Dec. Dig. § 174.*]

27. EVIDENCE (§ 471*)—CONCLUSIONS.

In an action against an irrigation company for loss of a crop through defendant's failure to furnish water, the testimony of a witness that there was a market at the nearest shipping point was not objectionable as a conclusion of the witness, particularly where the witness qualified as an expert on the value of the products composing the crops destroyed.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2149–2185; Dec. Dig. § 471;* Witnesses, Cent. Dig. §§ 833, 836.]

28. WITNESSES (§ 255*)—EXAMINATION—REFRESHING MEMORY.

In an action against an irrigation company for damages to a crop, witnesses testifying to the number of pounds of cabbage raised on certain land and relating transactions covering several months and scores of shipments were properly permitted to refresh their memories by reference to written data made by them, or under their direction and within their knowledge.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 874–890; Dec. Dig. § 255.*]

29. APPEAL AND ERROR (§ 1054*)—HARMLESS ERROR—ADMISSION OF EVIDENCE.

In an action for damages tried without a jury, the admission of certain documentary evidence was harmless, where it could have been rejected without changing the result.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4185, 4186; Dec. Dig. § 1054.*]

30. WATERS AND WATER COURSES (§ 261*)— IRRIGATION—LIABILITY FOR DAMAGES.

Where an irrigation company negligently failed to provide an adequate system of pumps and machinery for pumping, though by the exercise of ordinary care it could have known that its plant was inadequate, and at a nominal expense could have increased its facilities for furnishing the water while the river was low, and where as a result it was unable to furnish a plantation company with the water to which it was entitled, it was liable for the consequential damages, though the low water in the river contributed to render it unable to furnish the water.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 261.*]

31. ABATEMENT AND REVIVAL (§ 41*) — GROUNDS—TRANSFER OF RIGHT.

It was not ground for the abatement of an action by a corporation that a person testified that prior to the commencement of the suit "he had made a bargain to buy" the stock and had "offered some" of the stock for sale; to make a bargain to buy not being to buy, and the offer to sell a part of the stock being immaterial in view of the fact that he already owned one-third of it.

[Ed. Note.—For other cases, see Abatement and Revival, Cent. Dig. §§ 212–220; Dec. Dig. § 41.*]

On Motion for Rehearing.

32. WATERS AND WATER COURSES (§ 261*)— IRRIGATION—ACTION FOR DAMAGES.

While the irrigation statute contemplates that an irrigation company may be unable to supply all water consumers with an adequate amount of water, this could not defeat recovery in an action against an irrigation company for failure to supply water, where the defendant's failure did not arise from the fact that other consumers used the whole supply.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 261.*]

Appeal from District Court, Nueces County; W. B. Hopkins, Judge.

Action by the Mercedes Plantation Company against the American Rio Grande Land & Irrigation Company. From a judgment for plaintiff, defendant appeals. Affirmed in part and reversed in part, and motions for rehearing overruled.

Duval West and Frank H. Booth, both of San Antonio, for appellant. Jas. B. Wells, of Brownsville, Mason Williams, of San Antonio, and F. W. Seabury, of Brownsville, for appellee.

TALIAFERRO, J.    This appeal comes from the district court of Nueces county, where it was tried upon change of venue from Hidalgo county. Appellee, the Mercedes Plantation Company, sued the appellant, the American Rio Grande Land & Irrigation Company, both domestic corporations, for damages arising from alleged breach of contract by appellant to furnish water to appellee for irrigation purposes. Appellee's allegations, in brief, were:

It was, as vendee of Roy Campbell, F. E. Scobey, and T. M. Lawrence, the owner of a tract of 197½ acres of land in Hidalgo county, Tex., north of and adjoining the right of way of the St. Louis, Brownsville & Mexico Railway Company, near the town of Mercedes. That the land was purchased by appellee's vendors from the appellant, and lies in a solid body, but was transferred to appellee's vendors by six separate deeds, four of which conveyed 40 acres each, one conveyed 18.06 acres, and the other 18.356 acres. All the several parcels of land were portions of a subdivision of a part of the "Llano Grande" 25½-league grant, made by the Spanish government to Jose Hinojosa Balli and confirmed by the Legislature of Texas, February 10, 1852. The land was purchased by appellee's vendors for the purpose of farming, and it was situated in a region in which, both from insufficiency and irregularity of rainfall, irrigation was necessary to the successful growing of crops thereon. That at the time of the land purchase the appellant was, and it is now, a corporation organized under the irrigation laws of the state of Texas for the sole purpose of appropriating, conducting, and selling water, in accordance with the powers, privileges, and liabilities contained in said irrigation statutes. By virtue of its incorporation the appellant on July 30, 1906, appropriated waters of the Rio Grande for the purpose of irrigating about 250,000 acres of land situated in Hidalgo and Cameron counties. That a portion of the said land bordered upon the Rio Grande and was riparian to the same, and that a portion of the land was nonriparian. Included in the irrigable land aforesaid was a tract of 40,000 acres out of the Llano Grande grant above mentioned, which appellant caused to be surveyed and subdivided into smaller tracts. These small tracts it offered for sale, and the land purchased by appellee was composed of a number of such small tracts. That appellee's farm lies within the watershed of the Rio Grande and is contiguous to appellant's east main canal and branch canals, and can be watered by a gravity flow therefrom when the water therein is at less than the highest safe water level

155 S.W.—19

reasonably obtainable therein, and that at the time mentioned appellee was entitled to demand and receive from appellant sufficient water to irrigate its farm. That on February 20, 1907, the appellant, acting through its authorized agent, sold to Campbell, Scobey, and Lawrence, appellee's vendors, the farm aforesaid for $40 per acre. That they paid a small sum upon the purchase price and went into possession, and began and made permanent and valuable improvements thereon. As an additional inducement to the sale, it is alleged that appellant's duly authorized agents agreed that the said company would "furnish water sufficient to irrigate all of the lands so sold on or before June 1, 1907, or not later than September 1, 1907, at a charge of $1 per irrigation per acre, but would later put the charge on a fair meter or acreage basis," and that the purchasers relied upon this verbal agreement to furnish water and closed the trade. The deeds to Campbell, Scobey, and Lawrence were not executed until November 15, 1907, and contained a reservation of the right to "construct and maintain pipe lines and ditches to conduct water over and across said lands and rights of way for its canals," but did not contain any agreement or reference to any agreement to provide water before September 1, 1907. It is alleged that appellant failed to furnish any water on or before September 1, 1907, but through its agents, Carter and Silver, promised and agreed with Campbell, Scobey, and Lawrence, who then still owned the land, to furnish them water on or before December 1, 1907; and at various dates thereafter up to May 23, 1908, continued to promise said Campbell, Scobey, and Lawrence that they would furnish adequate water at early dates thereafter.

On May 23d Campbell, Scobey, and Lawrence formed themselves into a corporation, the Mercedes Plantation Company, which was plaintiff in this suit below. Campbell, Scobey, and Lawrence were the owners of all the stock of the corporation and conveyed to it the said land and all their rights, contracts, and causes of action in the premises. That at various dates from May 23, 1908, to August 1, 1908, appellant, by its agents, continued from time to time to promise at an early date to provide adequate water, but that nevertheless it failed to furnish any water to appellee until October 15, 1908, and did not furnish sufficient water until December 1, 1908. That all the water provided up to January 19, 1909, was furnished under the aforesaid verbal agreement, on which date appellant and appellee entered into a written contract, and that appellee paid the charges for all the water furnished under said verbal contract in accordance with its terms, and that appellant company received the money so paid.

It is alleged that, by making and delivering deeds to the land, the receipt of the pur-

chase price, the delivery of water, and acceptance of payment for water charges, in all things ratified the representations and acts of its agents to Campbell, Scobey, and Lawrence and to appellee, and that appellant is estopped from denying said agents' authority. It is alleged that immediately after the agreement to purchase the land, on February 20, 1907, Campbell, Scobey, and Lawrence began to clear, plow, and fence the land, and that they and their vendee, the appellee, had kept the said land continuously cleared, cultivated, and ready for planting, with its field ditches and laterals ready to receive and carry water until December 1, 1908, but that appellant, up to that time, wholly failed to furnish any water. Appellee alleged its damages as follows:

(1) That Campbell, Scobey, and Lawrence suffered a loss of $12,000 by reason of appellant's failure to provide an adequate amount of water to properly irrigate the tract of 197½ acres from June 1, 1907, to December 1, 1908. That they had specially prepared the said land for planting truck and had cleared the same and maintained it in a plowed and cultivated state during that time, with laterals and ditches ready to receive the water. That if they had been provided with water during that period they would have raised two crops of truck which would have netted $12,000 above expenses, but without the water the land was worth but $35 as rental for grazing purposes.

(2) The second specification was for special damages claimed to have been suffered by reason of the fact that appellee was obliged to keep employed men and mules in the preparation of the said land; but as the judgment of the court was for appellant upon this issue, and same is not assigned as error by appellee, it need not be further discussed.

(3) That appellee, on January 1, 1909, desired to plant, and, relying on appellant's duty and promise to furnish water, was ready to plant, about 100 acres of said farm in cabbage. That on said date it had a patch of 29 acres grown from the seed, and that same were well grown and hardy. That from these 29 acres it expected to obtain plants sufficient to transplant the balance of the 100 acres, and that they would have been able to do so but for failure of appellant to furnish water. That they demanded water for delivery upon said date, but that appellant failed to furnish the same until January 4th, and then only sufficient to irrigate 2 acres. That it then discontinued the supply of water until January 11th, and that in the meantime they were compelled to pull up and throw away 300,000 cabbage plants, which could and would have been transplanted upon 25 acres of the said land, if appellant had supplied the water in accordance with its obligation, and that said land would have matured and returned a crop worth $12,500. But that because of appellant's default aforesaid appellee was obliged to plant said 25 acres in cotton and corn, which returned a crop worth but $700, and that, after deducting the expense of raising said crop, it suffered a net loss of $7,500.

(4) It was further alleged: That on January 19, 1909, appellant and appellee entered into a written contract for the supply and receipt of water, wherein appellant agreed, upon certain terms and conditions, to deliver to appellee adequate water to irrigate its farm. That appellee complied with all the conditions of said contract and relied upon appellant's promise to deliver water in sufficient quantities on demand, and on January 20, 1909, planted 80 acres in early cabbage. That on April 17, 1909, said cabbage needed but one irrigation to close up and harden the heads, and that on said date it demanded of appellant sufficient water to irrigate 37 acres thereof. But that appellant failed to furnish it any water until May 6, 1909, and that even then it furnished water for 25 acres and refused to furnish more. That on various dates from April 20th to May 6th the balance of the 80 acres of cabbage had been in need of irrigation, but that because of appellant's prior and repeated refusal to furnish water appellee knew it was useless to make formal demand therefor, and for that reason did not make the demand provided for in the aforesaid contract. By reason of this failure to supply the water, appellee entirely lost 12 acres of the cabbage, and all the balance thereof was greatly damaged by loss of weight and deterioration in quality, and that by reason of said failure to furnish water for said 80 acres of cabbage appellee suffered a net loss of $12,000.

(5) That on January 20, 1909, the appellee planted 10 acres of cucumbers, and on April 21st it demanded water to irrigate them for April 27th. But that appellant refused to furnish any water for that purpose until May 8, 1909, which was too late for the needs of said cucumber, and they were very greatly damaged thereby in the net amount of $12,000.

(6) That on January 20th appellee planted 10 acres in early tomatoes. That said tomatoes needed irrigation on April 28th, and demand therefor was duly made upon appellant. But that it failed to furnish water therefor until May 6, 1909, because of which said tomatoes were greatly damaged and appellee suffered a net loss of $2,000.

Appellee further alleged that by its written contract with appellant, dated January 19, 1909, as aforesaid, it agreed to buy, and appellant agreed to sell and deliver to it, water for the irrigation of the 197½ acres aforesaid, on certain terms and conditions. The contract contains the following clause: "The purchaser waives all claims for loss or damage by reason of any high or low water of the Rio Grande, or any break, leak, seepage or overflow from the reservoirs, canals or branches thereof, or any parts of

the irrigation system, under the control or supervision of the company, or for any other cause, except such loss or damage as may be caused by gross negligence of the company. No claim for pecuniary loss or damage shall be enforceable against the company unless the company is notified of the same and of the amount thereof, within ninety days after the act complained of, and in no event in excess of ten dollars per acre, of the land."

Appellee alleges that the limitations upon the liability of the appellant contained in the above clause are contrary to law and void because the appellant is, and was then, an "irrigation company for hire, vested under the laws of the state with the right of eminent domain, and is a quasi public corporation," whose business and duty it is to transport and sell to landowners, whose land is contiguous to its canals, water from the Rio Grande for irrigation purposes, upon reasonable terms and without unreasonable restrictions on its liability for failure to do so. It was further alleged that appellant was, by reason of a duty imposed by law, under obligation to furnish appellee water to irrigate its lands which were contiguous to its canals, upon a fair and equitable basis without any unreasonable restrictions; that in disregard of this legal duty appellant, by refusing to supply water as it was legally bound to do, coerced and required the appellee to make the said written contract; and that said written contract was therefore without consideration and void.

Appellant answered by general demurrer, numerous special exceptions, by general denial, and special answer, as follows:

It admits that it was a corporation, chartered under the general irrigation laws of Texas, and that at the time it was owner of about 100,000 acres of land in the Llano Grande grant fronting the Rio Grande, in the counties aforesaid fronting on the said river and within the watershed thereof. But it alleges that at the time of purchasing said land it also acquired its vendor's right to a free use and enjoyment of the waters of the Rio Grande for irrigation and domestic purposes; that all said land was riparian to said river, and by purchase thereof it became possessed of the rights of a riparian owner on said stream; that it surveyed, subdivided into small tracts, and platted 40,000 acres of said land, and of this subdivision on November 15, 1907, conveyed the 197½ acres aforesaid to Roy Campbell, F. E. Scobey, and T. M. Lawrence in several separate tracts, and by several separate deeds. It further alleges that at the same time, and as a part of the consideration for said sale, it also agreed to convey to the purchasers "the right to receive water from the canals to be constructed by it, and that the right conveyed to said purchasers passed to and became vested in the appellee as purchaser from said Campbell, Scobey, and Lawrence.

It alleges, however, that on November 15, 1907, it was engaged in the construction of its canals from the Rio Grande, but did not complete them until about September, 1908, to a point where it could supply water to appellee's land; that all its said canals, ditches, etc., when completed, were wholly within the 40,000 acres, and they were constructed solely to irrigate its own land or to the lands of its vendees wholly within the said 40,000-acre tract; and that it has never appropriated to itself the use of any water or land by virtue of the power of eminent domain. It alleged that it was further stipulated in said sale that the appellant should have free access to and easement over the land sold to construct its pipe lines and ditches and to run its roads and highways over and across, and erect its poles and wires upon and over the same for the purpose of constructing and maintaining irrigating and operating plants, etc., and for sale of water, light, heat, etc.; that thereafter on the 19th day of January, 1909, it, in accordance with previous agreements, entered into the written contract with appellee for the sale and receipt of water for irrigation purposes, hereinabove mentioned. And it is alleged that appellee, upon a valid consideration, made the said contract and agreed, among other things, to the limitation of appellant's duties and liabilities as hereinabove quoted; that its agreement to convey water to appellee was based upon the covenants and agreements set out in said contracts and upon all of them; and that appellee is bound thereby and is conclusively estopped to deny the same or to aver that they have any effect other than that expressed in said written contract.

Appellant further says that the terms and conditions of said contract are just and reasonable and were freely entered into by appellee, who well knew that irrigation in that section was an untried experiment and that the lands sought to be watered were undeveloped and unproductive and that the feasibility of conducting water to them was uncertain; that the season of 1908 and 1909 was the first in which an effort was made to raise crops by irrigation along appellant's canals and neither appellee nor appellant had any means of knowing what would be the result of such experiment; that appellant, in developing the said enterprise, had spent more than $2,000,000, but that said venture was hazardous and experimental, and so understood by both parties to this suit; and that with full knowledge of these facts, and because thereof, appellee, joining with appellant in the effort to meet and overcome such doubts and difficulties, freely and willingly entered into the written contract aforesaid. Appellant further alleged that a special consideration was recevied by appellee, in this, that in consideration of appellant's agreeing to construct field canals, laterals, and ditches across certain lands belonging to

appellee, not included in the 197½-acre tract, which were so constructed at great ·cost to appellant, appellee agreed to sign, and did sign, the said contract. Appellant also pleaded the statute of limitations and the negligence of appellee in failing to exercise reasonable care to prevent the damages of which it complained, after the same became apparent to it and imminent because of appellant's alleged inability to furnish water.

Appellant further pleaded that by reason of its written contract with appellee it was excused for failure to furnish water by reason of "casual, unforeseen, or unavoidable accidents," or by reason of insufficient water in the Rio Grande or any other cause beyond the control of appellant; that the appellant might cut off the water supply for general or special repairs, or for any other matter incident to the conduct of its business and for such time as might be necessary; that upon the occasions alleged by appellee, if it failed to furnish water, the failure was caused by the low water level in the Rio Grande and by stopping its machinery for repairs upon the same, made necessary by damage thereto arising from causes over which they had no control, all of which appellee knew, and all of which it had in anticipation when it signed the said water contract. Appellant further alleged that appellee did not comply with the rules agreed upon between them in giving notice of its need for water, and that at no time did it give to appellant the notice required by said rules except for irrigation of 37 acres of cabbage, and that water to irrigate said 37 acres was at once furnished in accordance with the said contract.

The case was tried without a jury and resulted in a judgment for appellee for $35,-291 and costs of court; the items of the judgment being as follows: (1) Damages resulting to appellee by reason of Campbell, Scobey, and Lawrence being deprived of water from June 1, 1907, to December 1, 1908, $9,821. (2) Damages resulting by reason of failure to supply water to enable appellee to plant 25 acres of land in cabbage in the month of January, 1909, $7,190. (3) Damages resulting from failure to supply water for irrigation of its cabbage crop on a portion of said land during the months of April and May, 1909, $12,000. (4) Damages resulting from failure to supply water for irrigation, during months of April and May, 1909, of 10 acres of cucumbers, $6,280. The court found for appellant upon the claim for damages to 10 acres of tomatoes. Upon the question of special damages for hire of men and mules in the care of the land the court found for appellant, and for the costs found in favor of appellee.

[1] In a preliminary counter proposition, appellee denies the right of appellant to have any of its assignments of error considered, unless they present fundamental errors, because appellant failed to file a motion for a new trial in the lower court.

Before the adoption of the amendments to the rules of practice by the Supreme Court on January 24, 1912, it was well settled that only questions involving the sufficiency of the evidence to support the verdict must be raised in·the motion for new trial. When the trial court overruled or sustained exceptions to pleadings or made rulings upon questions presented during the trial, such acts were not required to be specially set out in a motion for new trial, because they became matters of record and were direct rulings of the court upon matters of law which the appellant had a right to assume would not be changed. W. U. Telegraph Co. v. Mitchell, 89 Tex. 441, 35 S. W. 4; Clark v. Pearce, 80 Tex. 146, 15 S. W. 787; City of Austin v. Forbis, 99 Tex. 238, 89 S. W. 405; Railway v. Sparger, 11 Tex. Civ. App. 82, 32 S. W. 49.

The amendment of the court rules as adopted on January 24, 1912, made changes which materially affect proceedings on appeal to this court, and the construction of the rules as amended is now of great importance to litigants. Among others, district court rule 71 (142 S. W. xxii) was amended by adding rule No. 71a (145 S. W. vii), as follows: "A motion for new trial shall be filed in all cases where parties desire to appeal from a judgment of the trial court, or sue out a writ of error in the cause, unless the error complained of is fundamental, except in such cases as the statute does not require a motion for a new trial." The clear meaning of this rule is that motions for new trial shall be required in every case, whether tried with or without a jury, except when the statute by express provision does not require such a motion. Such an express exception is made by article 1333, R. S. 1895, as amended by Acts of 1899, p. 190, which reads in part as follows: "In all cases where special verdict of the jury is stated, or the conclusions of fact found by the judge or separately stated, * * * it shall be sufficient for the party excepting to the conclusions of law or judgment of the court to cause it to be noted on the record in the judgment entry that he excepted thereto, and such party may thereupon take his appeal or writ of error without a statement of facts or further exceptions in the transcript."

The Court of Civil Appeals of the Seventh District, in Nunn v. Veale, 149 S. W. 758, held that rules 24 and 25 (142 S. W. xii) as amended required a motion for new trial to be filed in every case. Rule 71a, as it was originally adopted, did not contain the last sentence therein, which excepts cases specially covered by the statutes. This clause was added by a subsequent amendment, and probably was not a part of the rule when the Nunn Case was under consideration, which accounts for the fact that the learned

judge who wrote the opinion in that case did not cite rule 71a. In the present case the court was requested to and did file separate conclusions of fact and law which brings it within the terms of article 1333, supra, and appellee's objection to the consideration of appellant's assignments of error is therefore overruled.

This case is properly divisible into three periods: (1) That from June 1, 1907, to December 1, 1908, during which time the appellee's right of recovery depends upon the alleged verbal contract to furnish water at a specific time and price; (2) that from December 1, 1908, the date upon which water was actually supplied, to January 19, 1909, when the written contract to supply water was executed; and (3) that from January 19, 1909, to the time of filing the suit. The rights of the parties at the several periods of time were materially different and were governed by different principles of law, and they should therefore be separately discussed.

[2] Appellant's assignments of error from 1 to 12, inclusive, raise the issue of the sufficiency of the verbal contract between the parties as a basis of recovery and contain two propositions. The first contends that appellant's fourth and fifth exceptions to appellee's second amended original petition should have been sustained for the reason that, "where it appears from the allegations of the petition that the result of negotiations between parties to a contract were reduced to writing and the petition seeks to vary the terms of the writing, it is subject to a special exception and should not be permitted." In the abstract, this proposition presents a sound principle of law; but it is not applicable to the facts here, which bring this case under another equally well established rule of law, i. e., when the original contract was complete in itself and was entirely verbal, *and a part only* thereof is subsequently reduced to writing, parol testimony as to such part is admissible, not for the purpose of varying or changing that portion which was reduced to writing, but to show what the original contract was in its entirety. Greenleaf on Ev. § 284a.

[3, 4] The second contention under these assignments is that the verbal agreement of appellant to furnish water, if it was made, was in contravention of the statute of frauds and void because not to be performed within one year. Three propositions are presented to support this theory, which, in a composite form, are as follows: "A verbal agreement which is not to be performed within the space of one year from the making thereof is void," and "a verbal agreement made for the sale, rental, or lease of a permanent water right concerns the sale of land and is void under the statute of frauds." The first of these propositions is correct only in a limited sense. A verbal contract which can-

*not* be performed within one year from the time of contracting is certainly void, but it is equally well settled that a verbal contract which *may* or *may not* be performed within a year does not come within the statute of frauds and is not void. Thomas v. Hammond, 47 Tex. 43; Tipton v. Tipton, 55 Tex. Civ. App. 192, 118 S. W. 844, and cases there cited.

The second proposition is not sound. The contract of the appellant to begin to supply water to appellee on June 1, or September 1, 1907, was a virtual agreement that the appellant's canals would be completed by that date so as to enable it to deliver water at that time. If the appellant company is a quasi public corporation, which we think it is, and which point we will fully discuss herein, then under article 5002, R. S. 1911, the right of the appellee to receive water from appellant upon land contiguous to its canals, without a contract of any kind, was, from the day its canals were complete and supplied with water, as complete and definite as the right to possession. It was an incorporeal hereditament which is as inseverable from the land as any other quality of title, and the only matters open to verbal contract with reference to the water were the price and terms upon which it would be delivered and the time at which it would be delivered. Appellant corporation was organized and chartered under section 11, c. 21, p. 23, of the Acts of 1895 (R. S. 1911, art. 5002 et seq.), and follows the language of that act in stating its purposes and powers. From these powers grow, by operation of law, its duties, which cannot be changed or lessened by its intentions. In Borden v. Rice & Irrigation Co., 98 Tex. 494, 86 S. W. 11, 107 Am. St. Rep. 640, the Supreme Court of this state held that such a charter creates a quasi public corporation which is charged with duties to the public commensurate with the powers and privileges conferred upon it by law. The Legislature in the above act has not very clearly defined the rights of the public nor the duties of the corporation, but a careful study of the language of the act in the light of the well-established principles of law makes clear the meaning. As aptly said by the learned judge who wrote the opinion in the Borden Case, the powers of the corporation are conferred to enable it to appropriate water and to convey it "to all persons entitled to the same"; to "all persons who own or hold a possessory right or title to land adjoining or contiguous to any canal," etc., and "who shall have secured a right to the use of water * * * in accordance with the terms of their contract." In case of a shortage of water, a plan for prorating the supply is provided, and *the sale* of a permanent water right is made an *easement* upon the land which will pass with the title, etc. It is further provided that, *in case no contract can*

*be agreed upon* between the consumer and the irrigation company, the consumer shall nevertheless be entitled to water *upon reasonable terms*. Such language, aided by the rule of law that only public or quasi public corporations are endowed with the power of eminent domain, can only be understood to mean that out of the grant of power to the corporation shall grow, ipso facto, the right of the property owner to receive, upon reasonable terms, a fair proportion of the water taken from the water course and conducted through its canals, and that the power of the corporation to contract for the supply of water is limited to such subjects as do not conflict with the rights of the parties as fixed by the law. In the Borden Case the court, upon this subject, said: "The power to contract, here given to the owner of the plant, cannot, if the business is to be regarded as affected with a public interest, be recognized as absolute and uncontrolled. Common carriers and others engaged in public callings have the power to contract, but it cannot be so employed as to absolve them from their duties to the public or to deprive others of their rights. Rights are evidently secured by this statute to those so situated as to be able to avail themselves of the water provided for, and those rights it is the duty of the owners of the contemplated business to respect; and the power to contract, under the well-recognized principles applicable to those charged with such duties, must be exercised in subordination to such duties and rights. Reasonable contracts are what this statute means, and not contracts employed as evasions of duty." 98 Tex. 511, 86 S. W. 15, 107 Am. St. Rep. 640.

[5] We come then to the verbal contract alleged to have been made by the parties and the consideration of its form and effect. This case seems to have been tried upon the theory that the transaction between Campbell, Scobey, and Lawrence and the appellant was only a contract of sale. We do not so view it. The transaction has all the elements of a verbal sale of land, and as such it must be treated. There was an agreement as to the price, the terms, and the specific property; the purchaser paid a portion of the purchase price; possession was tendered and accepted; and valuable improvements were made. In so far as lay in the power of the appellant's agents, L. R. Carter and S. P. Silver, to sell the land, this constituted an executed contract, and the subsequent delivery of a deed was a mere incident which a court of equity would enforce at any time upon the prayer of the purchaser. Hendricks v. Snediker, 30 Tex. 296; Robinson v. Davenport, 40 Tex. 341; Willis v. Matthews, 46 Tex. 483; Wooldridge v. Hancock, 70 Tex. 18, 6 S. W. 818; Ward v. Stewart, 62 Tex. 333; McCarty v. May, 74 S. W. 804.

[6] This view of the case calls for the consideration of the nature of authority possess-ed by Carter and Silver as agents of appellant company. It is not disputed that Silver was general manager of the company in charge of the sales of land. Appellee alleges that L. R. Carter was vice president of appellant company, but the evidence shows that he did not hold that office, or any other office, on the 20th day of February, 1907, upon which the verbal contract is alleged to have been made. The trial court found as a fact that both Carter and Silver had private instructions from appellant company not to make any promises to deliver water at any particular time. Therefore it cannot be contended that they had actual authority to promise Campbell and his associates to deliver water at any specific time. Was their position at the time, and were the circumstances, such as to reasonably make it appear that they had such authority, and to so convince Campbell and his associates of such authority, as to induce them to act upon the presumption and part with value because of such belief? Appellee, citing Gashwiler v. Willis, 33 Cal. 11, 91 Am. Dec. 607, in its answer to appellant's twenty-fifth assignment of error, very forcefully says that the rule is firmly established in this country that the powers of a corporation can be exercised only by its board of directors, regularly assembled in a directors' meeting; that all of the directors acting separately have no power to sell or authorize the sale of corporate property. We think appellee has well stated the law, and agree with it that the Gashwiler Case is well sustained by authority.

Let us then consider the facts surrounding the sale of the land and the verbal contract to deliver water, and see if it comes within the law. The trial court found, with reference to the contract to furnish water, the following, as the facts: "The said purchasers refused to buy said lands unless they had an agreement with the American Rio Grande Land & Irrigation Company fixing the date when water should be delivered to said lands, and also fixing the amount of the water charges thereupon. In order to induce said Campbell, Scobey, and Lawrence to purchase said lands, the said Carter and Silver, acting for said company and on its behalf, and within the scope of their authority, so far as was or could be known to said purchasers, promised them that water would be delivered to said lands about the 1st of June, 1907, and under no circumstances later than September 1, 1907, and that the charges therefore would be $1 per acre per irrigation, and not to exceed $6 per acre per annum, but that later the charges would be based upon some fair meter or acreage basis, and required the said purchasers to farm the lands at once."

What then was the evidence upon which Campbell and his associates were led to the belief? No circumstances short of actual notice of express authority would justify

purchasers of land to assume that a general manager of a corporation had authority to sell the land of the company. A general manager can be presumed to have such authority as is necessarily incident or customarily exercised by officers of like position. Thompson on Corp. §§ 4871–4887; Land Co. v. McCormick, 85 Tex. 416, 23 S. W. 123, 34 Am. St. Rep. 815; Liquor Co. v. Magnus, 43 Tex. Civ. App. 463, 94 S. W. 1117; Green v. Hugo, 81 Tex. 452, 17 S. W. 79, 26 Am. St. Rep. 824. There can be no presumption that such an officer has the authority to exercise a power which is vested only in the board of directors or governing power, such as selling the land of the corporation. Hurlbut v. Gainor, 45 Tex. Civ. App. 588, 103 S. W. 409. As has been shown, L. R. Carter was not at that time an officer of the company, and no presumption whatever could be indulged as to his authority to bind the company by a contract with reference to the land. Furthermore, Campbell, according to his own testimony, had actual knowledge that neither Carter nor Silver had a right to sell them the land of the company, nor to make a price thereon, and, at Campbell's personal request, Carter telegraphed to the president of the company at St. Louis to obtain authority to fix a price upon the land. Neither Carter nor Silver had authority to sell the land, and there were no sufficient facts or circumstances to reasonably lead the purchasers to believe that they had such authority. Therefore it follows that neither the sale of the land nor the contracts or agreements leading up to the sale were binding upon the appellant, unless such acts were by it ratified or confirmed.

[7] If the appellant, after the contract and sale of the land, with such a full knowledge of the facts as would put it upon a level footing with the purchasers of the land, ratified the acts of its agents and adopted their trade as its own, it would be estopped to deny the same as if the contracts had been made with full formality and authority. On the other hand, if the acts of the agents were not ratified, or if their acts were adopted under an honest misapprehension of the facts and without that full and fair knowledge which good faith and honest dealing require, appellant would not be bound by that portion of the transaction of which it was in ignorance. Hurlbut v. Gainor, supra; Conley v. Ry., 44 Tex. 579; Toyaho Creek, etc., Co. v. Hutchins, 21 Tex. Civ. App. 275, 52 S. W. 101; Thompson on Corporations, § 5258; Cook on Corporations, vol. 2, § 720.

[8] At this point it should be noted that the trial court found as a fact that "in order to induce said Campbell, Scobey, and Lawrence to purchase the said lands, the said Carter and Silver, acting for said company on its behalf, * * * promised them that water would be delivered to said lands about June 1, 1907, and under no circumstances later than September 1, 1907, and that the charges therefor would be $1 per acre per irrigation and not to exceed $6 per acre." From this finding of fact, it is clear the learned court who tried this cause believed that the promise with reference to the supply of water was to be considered as a part of the consideration. Appellee lays great stress upon the value of the water supply, and that it was sold with the land and became a part of the land and value passing to the purchasers. It cannot be denied that it was a valuable and important right, of the utmost interest to both the seller and the buyer, which a man of ordinary prudence would have seen the necessity of guarding with care and following up with diligence. Moreover, it was a contract which any person of ordinary circumspection could have seen might be difficult, if not impossible, of performance. The construction had not progressed to a point where it was possible to judge with certainty the time of completion or the certainty of success; and the proposed purchasers testified that they had made careful inspection of the construction and were apprehensive from the first that it might not be adequate. With this knowledge, ordinary prudence would have caused the purchasers to follow up the matter of their water rights and to see that they were recognized and protected. Let us see how this subject was followed up by the purchasers. The sale was made on February 20, 1907, and the purchasers entered into possession; the deed was executed on November 15, 1907, and during this time no effort was made to confirm the presumed authority of appellant's agents.

On the contrary, Mr. Campbell, who with Scobey and Lawrence were about to organize a corporation to cultivate the said farm (which corporation was formed and is appellee in this cause), during March, 1907, entered into a correspondence with T. W. Carter, president of appellant company, the chief purpose of which appeared to be to induce the appellant to become interested in the stock of the proposed corporation, and to obtain extensions of the time of making deferred payments on the land. Carter answered these letters, and on several occasions spoke of the uncertainty of the time when the delivery of water might be expected. Yet there was never any statement made by Campbell in any of his letters that would naturally have been construed into a notice that he relied upon a contract of appellant company to deliver water at any specified time until April 8, 1908, long after the deed was made and delivered. The expressions in a series of letters, on the contrary, written during 1907, indicate that there was a general belief that the time of the completion of the canal was problematical, and, while the purchasers were anx-

ious to obtain the water, there was no effort at that time to charge appellant with fault on account of the delay. On March 11, 1907, Campbell wrote to President Carter, at St. Louis: "I understand that you will very likely have the ditch completed by June 1st. If you do, it would be quite satisfactory to us to have the notes made payable June 1, 1908." In this letter he urges the appellant to accept 75 per cent. of the stock of the corporation to be formed by him to improve and farm the land in question. The letter contains these words: "I wish you would give the matter further consideration, and if you finally decide that you cannot accommodate us in this way, *we will have to withhold operations until next year*, when very likely all of us will have more money than we have at present."

On March 15th he wrote: "We are not at all satisfied with the progress that your company is making towards putting water on the land that we have bought, and unless some strenuous efforts are used by your company it would be impossible for us to mature a crop of vegetables on any part of the land this coming winter and spring. We now have 40 or 50 men at work on the land, clearing and fencing, and will spend considerable money each month, and will put on 100 men if it is possible to secure them, with a view of getting the land in condition in time to make a crop this fall, dependent, of course, on whether or not we receive a favorable answer from you in regard to the accommodation you will give us, by taking our stock in lieu of vendor's lien. In regard to first payment, Mr. Scobey and your son, Mr. Ray Carter, discussed this matter quite thoroughly within the past week, and your son suggested that on account of the uncertainty of water being put on the land in time to make a crop this fall that our first payment should become due on Sept. 1st, our second payment 18 months after, the third and fourth payment one and two years later. * * * The organization of this stock company is absolutely necessary if we go ahead with clearing the land and mature the crop, as we have not sufficient funds available to go ahead with the work. I can see no objection on your part to giving this concession to us, accepting the $66,000.00 worth of stock in lieu of vendor's lien and releasing the land to the stock company. * * * Upon receipt of this letter please wire us whether you will accept our proposition or not, as if you do not we will withdraw our men from developments, and will comply with our part of the contract and let the land rest for the present."

On April 9th he wrote: "Up to the present time you have given us no concessions, with the possible exception of agreeing to extend the time of our first payment to June 1, 1907, and that feature I am not partial to, for I believe that the money we are spending on the land at present in clearing, fencing, and otherwise developing the property that we should not be expected to pay our money until we are reasonably sure of securing water in time to make a crop this fall. It might not be out of place for me to say that I would not give you five dollars per acre for the land that we have agreed to purchase unless water was made available to the land, in fact I would not have it at any price, as I consider it worthless unless under irrigation, and it seems to me that it would be asking you very little to extend the time of our first payment to a date that water can be used by us. It seems to me too much like buying a pig in a sack, and while I have great confidence in the engineers that have planned the irrigation system there might be some contingencies arise that would prevent us from farming the land or any part of it for two years, and I will ask you to reconsider your decision to exact one fourth cash payment June 1, 1907. * * * While I did not have a positive agreement with your son, when I discussed this stock company plan with him, that it would be agreeable to your company to accept our proposition, he gave me his assurance that there would be no trouble on that account. If he had not, Mr. Lawrence and myself would not have gone into the matter as deeply as we have for we knew at the time we made the purchase that we did not have sufficient funds to develop the property in the way that we desired, and the way that it should be developed in order to make a paying proposition out of it."

On November 5th he wrote: "We have spent in improvements on the north part of our land $6,050.00 and have about 150 acres cleared in good condition but will have to stop for lack of funds." And on November 11th as follows: "On account of the failure of two of our banks it has made it almost impossible to secure money from the others. With the assurance from your company from time to time that we would have water to make a crop next spring we have spent more money in the development of the land than we otherwise would, amounting to more than $6,000.00, and this money is now unproductive, and will be for the next eighteen months."

On April 11, 1907, T. W. Carter, as president of appellant company, answering one of Mr. Campbell's letters, said: "Regarding the time when we will be able to furnish water, we are not in a position to say. We are working as fast as we can, and it is certainly to our interest to complete our canal and furnish water as promptly as possible." In this letter the matter of appellant's taking stock in the corporation being formed by Campbell, Scobey, and Lawrence and also the manner of arranging the deferred payments on the 197½ acres of land, were discussed. Again, on May 11, 1907, Carter, in

writing to Campbell, said: "I would thank you to give me directions as to the deeding of the land that you and your associates have bought from our company. * * * Work on the canal is progressing just as fast as it is possible. We have not reached a point yet where we can say when we shall have water in the canal, but we are doing all that we can, and we are much more anxious than any one else could possibly be to get the pumps going." A copy of this letter was also sent to Scobey. On November 13, 1907, before the execution of the deed, in replying to Campbell's letter of November 11th, in which he used the words, "with assurances from your company *from time to time* that we would have water to make a crop next spring" (the spring of 1908), Carter replied: "We note what you have to say about the failure of several banks in your city and as a result the difficulty of obtaining money from the others, and also the amount of money you have spent in development of the land at Mercedes, with the assurance as you say, from this company that we would give you water in time to make a crop next spring; but on this point we beg to differ, as we have never made any promise to any one that water would be ready at any definite date."

Not until April 8, 1908, did Campbell or any one else ever directly put the appellant company on notice that they claimed a right, by verbal contract, to have water delivered on their land not later than September 1, 1907. On March 25, 1908, Campbell, in writing to Carter, said: "Mr. Lawrence has just returned from Mercedes and takes a very pessimistic view of the situation there. He talked to Mr. Davis in regard to the time that water would be offered to us and he could not get an expression from him as to whether we would have water there by August 1st, although we have been assured by your representatives at Mercedes time and time again that we would have water not only to make a crop in the fall of 1908, but we expected water for irrigation for a crop in the fall of 1907. * * * Notwithstanding the statements made by the St. Louis office of your company that no definite date has been named as to when water will be offered us, we have had assurances from your representatives at Mercedes time and time again that we would have water in the spring of 1908, and in sufficient time to make a fall crop this year." To this Carter replied, on March 27th: "I am in receipt of your favor of March 25th. If any one at Mercedes has given you any assurance for any definite time that this company will deliver you water, or deliver water to any one else, they have done so without any authority. It would be impossible for us to name any date. All that we can do is to hurry the work along as fast as possible and this has been done in the past and we expect to continue to do it in the future." Campbell then wrote, on April 8, 1908: "We were given assurance that we would have water when we bought this land, and the time was set, the fall of 1907, and you certainly could not expect us or any one else to buy land of you and await your own pleasure as to the time when the water would be offered. We have been out of the use of this land one year now and we certainly expect you to be liable if we do not have water for the fall crop, that is by the middle of August. Mr. Scobey advises just to the *contract* (contrary) to the statements contained in your letter. The work is not being pushed and at the present rate of progress it will be another year before we can hope to secure water for irrigation. I do not know where the trouble lays and I have no comment to make except to say that we want the water and I most positively assert that we were assured water by your representatives at the time the land was purchased, and this statement was not only made to us, but to many others who have been disappointed in a like manner." And this last letter from Campbell contains the first positive assertion of an express agreement by appellant's agents to deliver appellee water at a specific time, and then he contends only that "assurances" were made.

The above facts are not sufficient to show actual authority in the agents of appellant to make the alleged verbal contract to deliver water at the designated time, nor are they sufficient to show that appellant had knowledge of such verbal contract which would render the subsequent execution of a deed to the purchasers a ratification of such verbal agreement, unless the deed by its terms was an express ratification, which is not the case, as the deed recites as the only consideration the purchase price of $40 per acre, and that as its only limitation the right of appellant to an easement upon the land for its laterals as set out in the statement of the case above.

[9] Appellee insists that the fact of appellant's supplying to appellee water at the price and upon the terms in accordance with the alleged verbal contract and collecting the money therefor is sufficient to charge it with notice of the contract and estop it from denying the authority of the agents. The record does not show that the price or terms upon which appellant supplied water to appellee was different from the price and terms upon which it was supplied to other water consumers. Appellee was, by law, entitled to water at a reasonable rate, without a contract, and the fact that it received and paid for water at the regular price could not charge appellant with notice of its claim to have been entitled to receive water at an earlier date. It follows therefore that the recovery of damages alleged to have resulted from appellant's failure to supply water to appellee before December 1, 1908, was un-

authorized. Morawetz on Corp. §§ 629–637; Cook on Corp. § 712; Thompson on Corp. § 2030; 10 Cyc. 1076; Elk Valley Coal Co. v. Thompson, 150 Ky. 614, 150 S. W. 817; Realty Co. v. Bank, 140 Ky. 133, 130 S. W. 965, 31 L. R. A. (N. S.) 169; Allen v. Loan Ass'n, 49 Minn. 544, 52 N. W. 144, 32 Am. St. Rep. 574; Loan Ass'n v. Bank, 181 Ill. 35, 54 N. E. 619, 64 L. R. A. 399, 72 Am. St. Rep. 245; Thompson v. Laboring Man's M. & M. Co., 60 W. Va. 42, 53 S. E. 908, 6 L. R. A. (N. S.) 311. This disposes of appellant's assignments of error Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 28, 28a, 28b, 29, 29a, 29b, 30, 34, 35, 36, 37, 38, 39, 40, 41, 42, 44, 45, 46, 47, 50, 51, 97, 98, 63, 64, 151, 152, 153, 171, 172, 31, 32, 33, 100, 166.

[10] We come now to the second period or division of the action—that between December 1, 1908, the date when appellant first was able to put water on appellee's land, and January 19, 1909, the date upon which the written contract was executed. As we have stated, the obligation of appellant to furnish appellee water during this period is imposed by law and is not dependent upon contract. That being so, the duties and rights of the parties must be measured by the reasonable requirements growing out of the respective positions of the parties.

It may be said that appellant owed appellee the duty to provide it with water for the purpose of irrigating its land contiguous to appellant's canals upon reasonable notice of its desire to use the water and upon reasonable terms and within the ability of appellant to supply the same by the exercise of reasonable diligence.

But one item of damage is predicated upon the failure of appellant to furnish water during the time named. That was for the recovery of damages by reason of the failure of appellant, upon demand, to supply sufficient water to appellee, from January 2 to January 11, 1909, to irrigate 25 acres of land, which would have been planted in cabbage if the water had been supplied. It was alleged that the land was in readiness for planting and irrigation; that appellee had strong and well-grown cabbage plants growing on its land and was ready to set them out upon said 25 acres; and that it made due and sufficient demand for water; but that appellant failed to furnish the water; that by reason of such failure appellee was not able to set out the said cabbage plants; that if it had been able to plant the said 25 acres in cabbage and had been furnished water to irrigate the same a large crop would have been grown of the net value of $7,500; and that by reason of appellant's failure to so supply the water it had been damaged in that sum.

The court found the facts in accordance with the above allegation and rendered judgment in favor of appellee upon this item for $7,190. The court further found that failure to furnish the water "was a breach of its then existing verbal contract with plaintiff, and a violation of its duties as an irrigation company for hire engaged in delivering water to owners of land adjacent and contiguous to its canals," etc. And upon the correctness of this finding by the trial court depends the validity of the judgment in favor of appellee upon the said item of $7,190.

[11] Appellant assails this portion of the court's judgment upon two grounds: First, that the damages claimed and awarded were special damages and that no previous notice that they would result from failure to deliver water at that time had been given appellant before the demand for water was made; and, second, that such damages were too remote and speculative to have been in the contemplation of the parties at the time.

Answering the first of these questions, it may be admitted that the damages were special in their nature, yet the judgment of the court is not open to the objection urged. That, written notice was served upon appellant on January 1st is in dispute, but the court found that such notice had been given on that date, and the fact that water to the extent of two acres irrigation was furnished immediately afterward is strong corroboration, if corroboration were necessary, which it is not, since the court so found upon conflicting evidence. This notice was followed up by a demand on the 4th of the month, and on the 5th appellee wrote the following letter: "Mercedes Plantation Company, Growers and Shippers Texas Produce. Mercedes, Texas, Jan. 5, 1909. Mr. W. S. Chaplin, Pres. A. R. G. L. I. Co., Mercedes, Texas—Dear Sir: On January 1st, we requested water to irrigate five acres of cabbage and we received water for about two acres. Then the water supply was cut off, leaving us about twenty thousand cabbage plants pulled which will be a total loss unless we get water at once. We have about one hundred acres of cabbage that needs irrigation from now on, and we want water every day. Please give us your prompt attention and advise us. Yours very truly, Mercedes Plantation Company, T. M. Lawrence, Prest. & Genl. Mgr."

Appellant contends that this letter only contains a notice that appellee fears the loss of 20,000 cabbage plants if water is not furnished at once. Such a construction is not consistent with the facts of the situation as they existed, nor with ordinary business judgment. Appellant was advised that it had 20,000 cabbage plants pulled which would be a total loss unless it got water. Got water for what? It does not take an expert or a farmer to have understood that those plants were pulled for the purpose of transplanting and that appellee needed the water at that time to enable it to transplant those 20,000 cabbage plants. It is not only a fact within the knowledge of all well-informed persons, but it is in evidence in this case, that cabbage plants are the means from

which the mature cabbage is grown by transplantation. Appellee's letter of January 5th was ample notice to appellant that if water was not at once supplied it would be unable to transplant the 20,000 cabbage plants, and that they would be subjected to all the damages naturally growing out of such loss. Nor ·was it necessary for appellee to daily repeat its notice. If appellant failed to furnish the water in response to its demand for a daily supply, appellee cannot be charged with negligence because it did not daily repeat a demand which it knew to be useless and vain.

[12] We come then to appellant's contention that the damage complained of was too remote and speculative to furnish a basis for recovery. The determination of this question will depend much upon whether or not the cabbage plants as they *were to be transplanted* upon the 25 acres constituted *a growing crop*, or were, as they grew in other ground, merely seeds which were in process of preparation to be planted upon the 25 acres of land in question. If the former is the case, one rule for the measure of damages will apply; if the latter, quite another rule will govern. The point is very fine, and the line of demarcation is difficult to locate. It is not sufficient, if it were true, that the plants partake of both the nature of seeds and of a growing crop. If the cabbage had been originally planted upon the 25 acres in question and only the process of thinning was required, they would without doubt be a growing crop. How does the fact that they were actually growing upon another portion of appellee's land at the time, and that transplantation was necessary to their development affect their quality? It is quite certain the plants are not seeds in the common acceptation of the word, and yet it seems equally certain that as to the 25 acres of land in question they would not constitute a growing crop in the common acceptation of the term. Neither the appellant nor the appellee has cited us to a case, nor have we found one, where the question has been discussed, and the difficulties presented in making the distinction have given us great concern. But we have reached the conclusion that the cabbage plants in their then condition on appellee's land were a growing crop as to the 25 acres. It is a well-known fact, and it is in evidence, that cabbages are grown by first planting the seed in a constricted place where by a special process of cultivation they are sprouted and grown to a stage of development where they are strong and vigorous, and that they are then transplanted to other ground specially prepared for their reception. The process of transferring the plants is as regular and as much in the contemplation of the planter as the original planting of the seed or the subsequent hoeing or cultivation of the developing cabbage. The whole is a procedure along the lines which knowledge and experience have shown to be the best way to cultivate and develop certain kinds of vegetables, one of. which is cabbage. There is no period of suspended animation, as is the case when seed are allowed to mature and are separated from the parent stem for future planting, and it would be a strained and unreasonable holding to say that the few hours of separation from the soil would convert the living plants into seed. It would be stretching presumptions no further tó say that the plants did not cease to grow, but continued during the time of their removal from the earth to grow and develop.

But no such finely drawn distinctions are necessary. The cabbage was planted on the land of appellee and was grown and developed in the usual and customary manner to a stage when it was ready to transplant into the land intended and prepared to receive it, all of which was in the contemplation of appellee at the time when the cabbage seed were planted, and there can be no rational question that the cabbage plants were a growing crop in relation to the 25 acres to which they were designed to be transplanted. The act of appellant which prevented appellee from transplanting the cabbage and thus continuing the process of cultivation was the same as if by its act the cabbage had been destroyed after it was transplanted. It was the destruction of a growing crop, and the damage resulting therefrom is the same as would prevail in case of a total destruction of a growing crop. As to what this measure of damages is, we find the decisions considerably in conflict, but we think the measure which has the support of the weight of authority to be that laid down by Justice Gaines, in Railway Co. v. Pape, 73 Tex. 503, 11 S. W. 527. The court says: "It seems to us that as a general rule the most satisfactory means of arriving at the value of a growing crop is to prove its probable yield under proper cultivation, the value of such yield when matured and ready for sale, and also the expense of such cultivation, as well as the cost of its preparation and transportation to market. The difference between the value of the probable crop in the market and the expense of maturing, preparing, and placing it there, will in most cases give the value of the growing crops with as much certainty as can be attained by any other method." The above is the culmination of the rule and is now finally settled in this state. In Railway v. Joachimi, 58 Tex. 456, it was held that the measure of damage was the difference in the value of the crop in the market immediately before and immediately after the damage and at the place of the damage. This rule was followed in Railway v. Young, 60 Tex. 204, and in Railway v. Carter, 25 S. W. 1023; but in the latter case it was held that the jury, in ascertaining the amount of damages thus allowed could take into consideration the value of the crop at maturity, less the cost of labor, care, and

attention necessary to put the crop in condition for the nearest market. Since that time the Supreme Court has adopted as the measure of damages the very reasonable and proper rule announced in the McGowan and Pape Cases. Railway v. Calhoun, 24 S. W. 362; Freeman v. Field, 135 S. W. 1073; Railway v. Kiersey, 81 S. W. 1045; Railway v. Gilbert, 124 S. W. 434; Putnam v. Ry., 43 Tex. Civ. App. 448, 94 S. W. 1102; Raywood, etc., Milling Co. v. Erp (Sup.) 146 S. W. 155.

[13] Under this view of the case, it becomes a mere question of evidence whether or not the damage for the loss of the 25 acres of cabbage is too remote and speculative for appellee to recover. The evidence was in conflict upon the subject, and the court found for appellee, and this court cannot disturb the finding. Appellant's assignments of error Nos. 43, 49, 49a, 73, 74, 92, 93, 131, 133, 173, 174, 175, 176, and 177 are overruled.

[14] It was, as contended by appellant, the duty of appellee to minimize its damage in so far as it was reasonably possible by a subsequent use of the land in the most profitable manner, and a failure to do so would, at least to the extent of what might have been made upon the land by reasonable diligence, have reduced the liability of appellant for damages. But the court found upon conflicting evidence that appellee, upon loss of its cabbage plants, at once attempted to procure plants from other sources, but was unable to do so, and also that there were no cabbage plants in or near Mercedes that appellee could have procured at the time with any reasonable certainty of bringing them to maturity. We cannot disturb this finding and do not believe appellee's manager was required, in the exercise of ordinary diligence, to leave the farm and other duties thereon, to go forth and seek cabbage plants for these 25 acres. If he made reasonably diligent inquiry in the vicinity and found none that were reasonably adaptable to appellee's needs, he had fully met the requirements upon him to be diligent. The ninety-third and ninety-fourth assignments of error are overruled. This also disposes of assignments Nos. 52, 53, 54, 165, 167, and 168.

[15] We come now to the third aspect of this case—the right of appellee to recover damages after the execution of the written water contract on the 19th of January, 1909. In its 13th assignment of error appellant contends that its special exception to appellee's petition should have been sustained upon the ground that the facts set out therein did not show a legal appropriation of public waters, or that it had ever acquired a superior right to the use of the waters of the Rio Grande for irrigation purposes, in that it was not alleged that appellant prosecuted its work on its canals diligently to completion to the intended place, the 250,000 acres of land above named, nor that the waters of said river had not been appropriated by any other person before June 30, 1906. There is no merit in this contention. If appellant had not the right to divert the water of the Rio Grande and sell the same, it does not lie in its mouth to deny it, when it is being sued for damages for failure to comply with such a contract. As said by Justice Brown, in Doty v. Barnard, 92 Tex. 107, 47 S. W. 714: "A person cannot accept and reject a right to the same instrument, or, having availed himself of it as to part, defeat its provisions in any other part." Appellant invokes the irrigation statutes to support his propositions. Whatever else these statutes may mean, they do not mean that a corporation can organize under their provisions and appropriate water from a navigable stream, and, after making contracts to sell such water to individuals who are by law entitled to receive the same, excuse itself from a negligent failure to comply with its contract by saying the water consumer has not affirmatively alleged and proved that it had a superior right to appropriate the water of such river. The thirteenth assignment is overruled.

[16, 17] Appellant's fourteenth assignment of error asserts that the trial court erred in admitting in evidence over its objection a certified copy of the declaration of intention to appropriate the water of the Rio Grande by appellant, wherein it purported to have expressed its desire to avail itself of the provisions of chapter 2, tit. 60, of the Revised Civil Statutes, said instrument being such a one as is required by law to be acknowledged and recorded, because the same was not filed in the case three days before the commencement of the trial and because no affidavit was filed alleging the loss of the original instrument as is required by article 3700, R. S. 1911. This assignment is well taken, and the court should have excluded the instrument. But the error was immaterial. The appellant was an incorporated irrigation company. It is not denied that such an instrument was filed and recorded, nor is there any doubt that the copy introduced was a correct copy of the original. The filing and recording of such an affidavit was a prerequisite to the right to appropriate the water. Under rule 62a for the Courts of Civil Appeals (149 S. W. x), a reversal of the case upon this ground is not justified. This also disposes of the fifteenth, sixteenth, and seventeenth assignments of error.

[18] Assignments of error 18 to 24, inclusive, present two questions: First, the court found as a fact that appellant "was, at the time mentioned in plaintiff's petition, an irrigation company for hire and engaged in the business of delivering water in accordance with its charter and water appropriation," and therefore that company was a quasi public corporation, vested under the law with the power of eminent domain; and that therefore, second, "it could not legally exempt

itself from liability, or limit its liability to plaintiff, by contract to an extent that was unreasonable, because plaintiff's right to receive water was fixed by the irrigation laws of Texas" and was not dependent upon contract. To both these findings appellant took exceptions and now urges that they are unwarranted by the law and the evidence. Appellant's position is not tenable. We have already discussed the legal status of appellant company and the relative rights and duties of appellant and appellee as an irrigation company and a water consumer under assignments Nos. 1 to 12. It may be admitted that the ancient grant to appellant's vendors vested in them the riparian rights to the waters of the Rio Grande, still appellant's assertion that the state had nothing to grant is untenable. If that were so, why should appellant apply for and accept the rights, benefits, and powers granted by the irrigation statutes? The state could yet grant the power of eminent domain and give appellant rights superior to a subsequent person or corporation desiring to use water from the Rio Grande and the many other rights and benefits that follow incorporation. And in return for those benefits the law has said that the people, who make the grants, shall have a corresponding right—that of being served fairly and impartially by such corporation and for a reasonable charge. The mere fact that appellant had not exercised its right of eminent domain or its right to supply water to persons on land not derived from it cannot alter the rule. It may not have yet come to a time when it was expedient to exercise its powers, but it none the less possessed them.

[19] The question remaining for determination, then, is to what extent appellant could limit its liability for damages resulting from its negligence. In the contract between it and appellee there was a clause providing that in no case, not even for gross negligence, should appellant be liable for more than $10 damages per acre for failure to supply water to appellee under such contract. This clause in the contract was attacked as unreasonable and void. It was both. The court found that actual damage of appellee in this case, upon some of the land, was much more than $10 per acre, and the evidence amply supports the finding. In Colorado Canal Co. v. McFarland, 50 Tex. Civ. App. 92, 109 S. W. 435, the court said: "If appellant, after making a contract with a landowner for furnishing water, could limit its liability for failure to do so to $4 per acre, regardless of the amount of damage actually suffered, it could so limit it to a much less sum, or provide against any liability whatever, and so evade altogether the performance of its duty." This language is equally applicable to the present case. Erp v. Raywood, etc., Co., 130 S. W. 897; s. c. (Sup.) 146 S. W. 155; Kinney on Irrigation (2d Ed.) § 1493.

[20] In its assignments of error Nos. 63, 64, and 65 appellant complains of the action of the court in overruling its exceptions to the 13th, 14th, 15th, and 16th paragraphs of appellee's petition, upon the ground that the allegations therein are contradictory, and because they show upon their face that appellee did not comply with its written contract of January 19, 1909. The allegations in these paragraphs are, in brief, that appellee made application in accordance with contract on April 17, 1909, for water to be delivered upon a certain day thereafter; that it needed water on that day to irrigate a particular crop on a designated portion of its farm; that it intended from day to day, as it was ready to use the same, to make demand for water to irrigate other portions of its crop; that appellant failed to comply with its written request and informed it that no water could be furnished at that time for any purpose; and that therefore, because it knew no water could be had, it made no written application therefor, because it would have been futile to do so. These allegations were sufficient. They put in issue the sufficiency of notice and fairly raised the question of appellee's justification in failing to continue making the demand provided for by the contract. The assignments are overruled.

[21] Appellant, in its ninety-ninth, seventy-seventh, and seventy-eighth assignments of error, lays great stress upon the fact that appellee, on April 17th, made a demand for water as above stated and did not thereafter make other demands for water as it was needed. As before stated in this opinion, it would be unreasonable to require a water consumer to give daily notice of his need for water when he knew it would be impossible for the company to comply with the demand. If appellant were now contending that it had ample water to have met the appellee's needs and that it failed to furnish water only because a proper demand was not made therefor, it would be different. But such is not the case. It does not claim that it could have responded to the notice if it had been given, but merely asserts that there was no sufficient evidence to support the court's finding that notice was given. The law does not require any man to do a thing that is futile. That a notice for water was given to appellant on April 17th is not disputed, and if appellant thereafter, until May 3d, had no water to supply, and appellee knew it, a further demand was not necessary. Appellant does not contend that it was able to supply water during that time. The court found upon evidence that it was not able, and the ninety-ninth, seventy-seventh, and seventy-eighth assignments must be overruled.

[22] However, while it is true that appellee was not required to continually repeat a request for water that it knew appellant could not supply, if it did make a demand

for water, it was bound by the language thereof. The contract between appellant and appellee provided that appellee should give "timely notice" of its desire for water in accordance with rules to be adopted by the irrigation company. Such rules were adopted and contained this provision: "All applications for water must be made · in writing on blanks furnished by the company, and each applicant shall state the number of acres to be irrigated, the location of the same, and the kind of crop to be irrigated, and the day when water is wanted. Every application shall be filed in the office of the superintendent or delivered to the ditch tender; but the company shall have five days within which to deliver water after the time specified in the application." Appellee acquiesced in this rule and gave its notices for water in accordance with its terms. Appellant contends that the uncontroverted testimony shows that on April 27th appellee gave the regulation notice that it required water to irrigate 15 acres of cucumbers to be delivered on that date; that on May 3d demand was made for water for the same purpose; and that on May 4, 1909, appellant supplied water in compliance with these notices to irrigate said cucumbers, but that same was diverted by appellee to other portions of the farm and used to irrigate cabbage. It is further contended that the uncontroverted evidence shows that appellee admitted that if water had been put on the cucumbers within six or seven days after April 27th they would have been saved and produced more than average crop, and that the cabbage to which the said water was diverted was already lost. From these facts appellant says the judgment of the court allowing $6,280 for the loss of said cucumbers is error.

If the facts were, as contended by appellant, uncontroverted, the appellee could not recover. But such is not the case. The court found that the first notice for water for these cucumbers was "shortly after" April 20th, and not on April 27th, and that the next notice was given on May 3d, and that water was first provided on May 6th, but that the head was so low it was of little effect, and that the first flow of water was had on May 7th. Every one of these facts was controverted, and the court's holding is final. Appellant contends that the court should have found that on the 4th of May water for the cucumbers was furnished, but that, instead of conducting it into laterals B and C, adjacent to which the cucumbers were growing, the water was carried past the mouth of those two laterals into laterals D and F and used for cabbage. This seems to be supported by uncontroverted evidence in all except that the water was so provided on the 4th of May, which is the crucial point in the matter. If the uncontroverted proof showed that the water was · furnished on May 4th, the time· would be within the seven days

fixed ´by the court's findings as the limit of time within which the cucumbers could be saved by irrigation. But the evidence shows that this water may not have been furnished until May 7th; the court so finds, and we must so hold. Assignments 77, 79, 79a, 79b, 79c, 80, 81, 82, and 95 are overruled.

Assignments 65a, 66, 67, and 68 are overruled. They attack the judgment of the court awarding $12,000 damages for partial destruction of a crop of 80 acres of cabbage. Appellant contends that the undisputed facts show that the crop, after April 27, 1909, the time at which it was alleged the damage was done, was a total loss, and that the court adopted the wrong rule in measuring the damage.

Although appellant in this case has filed a brief of 737 pages and a supplemental brief of 22 pages, it supports these assignments of error and the five propositions thereunder with a statement of twelve lines, and refers us to the transcript and statement of facts, documents which in the aggregate have more than 2,000 pages, for the matter with which to support its contentions. We will not waste the time of the court in such work. Chief Justice Pleasants, of the First Court of Civil Appeals, in a recent case decided by that court, said: "We deem it proper to say that much of appellant's brief is taken up in the presentation of questions of no consequence or materiality in determining the merits of the appeal. The practice of writing unnecessarily long briefs seems to be growing, and often the pleadings and arguments presented in this court could be more properly designated a book than a brief. The practice is the cause of much of the delay in determining appeals." These remarks are particularly applicable to this case. More than 200 assignments of error are urged in this case, and they are so arranged that in some instances more than a dozen assignments scattered over the brief, without any reference to or connection with each other, raise the same issue in different forms. This manner of presenting cases to appellate courts cannot be too much deprecated, and, if it were not that the present case is one of the greatest importance, in view of the present extraordinary development in irrigation enterprises of Texas, we would refuse to consider the briefs in their present form. In reference to assignments 65a, 66, 67, and 68, they show no error committed by the court. There is no material difference between the rules which apply to the measure of damage in case of partial destruction and in that where the crop is wholly destroyed. The rule laid down in the Pape Case, above cited, was in reference to a crop partially destroyed, and the doctrine there announced is now the approved rule in this state.

Appellant's assignments of error Nos. 69, 70, 71, 72, and 75 assert that the finding of the court that appellee's cabbage were plant-

ed and transplanted at different times in November and December, 1908, and January, 1909, and that therefore if water had been supplied for its proper irrigation the marketing season would have extended from March 8th to the last of May, 1909, instead of continuing for the usual period of about six weeks, is contrary to the undisputed evidence. The evidence is not undisputed upon this question. On the contrary, there is some evidence to support the court's findings upon all the above matters, and, that being the case, the conclusions of fact complained of cannot be disturbed, and the assignments are overruled.

[23] By its assignments of error Nos. 76, 83, 84, 85, 86, 87, 88, 89, 90, 96, 134, 135, 137, and 138, appellant contends that the court erred in allowing appellee to recover as damages for the loss of cabbage and cucumbers by reason of the failure to supply water after April 27, 1909, an amount measured by the average price of cabbage from March 8th to June 5th, instead of the average price from April 27 to June 5, 1909. These assignments must be sustained. It is not the contention of appellee that any loss was suffered before April 27th. The price of cabbage from March 8th to April 27th averaged nearly double the average price after that time, and we can see no possible theory upon which the court could have applied that measure. The court found as a fact: "I further find that if the cabbage harvested prior to defendant's failure to furnish water be wholly separated, so far as is practicable, from that subsequently harvested, the aggregate market value of the probable yield of that portion of the crop that would have matured after April 20, 1909, less the amount actually realized therefrom, the further expenses of cultivating, watering, harvesting, and marketing that portion of the crop, would have amounted to more than said sum of $12,000." Appellant objects to this finding as against the undisputed evidence, which we find to be the case, and also that it contradicts the court's own finding upon the prices after April 27, 1909. Its conclusions upon this subject are as follows: "At Kansas City, Mo., the nearest market from which regular quotations were offered in evidence, March 13th, $3; March 20th, $3; March 27th, $3; April 3d, $2.60 to $2.85; April 10th, $3 to $3.25; April 24th, $3; May 1st, $2.50 to $3; May 8th, $2; May 15th, $1.65 to $1.75; May 22d, $1.65 to $1.75; May 29th, $1.65 to $1.75; June 5th, $1.50 to $1.65. From these market prices, the cost of transportation to Kansas City and sale there, aggregating $20 per ton, should be deducted."

The court further found that "had water been furnished for said cabbage on or within seven or eight days of April 20, 1907, all of said cabbage would have fully matured, and the probable yield thereof would have been not less than 20,000 pounds per acre." Upon 80 acres this would have produced 1,600,-000 pounds of cabbage. The court found that 734,000 pounds were marketed before April 27th, and 4,000 pounds afterwards, or an aggregate of 738,000 pounds. Deducted from 1,600,000 pounds, this would leave 862,-000 pounds that the court finds would have been the yield after April 27th, and therefore represent appellee's loss. It will be seen that the average price from May 1, 1909 (the first quotation after April 24th) to June 5th was $2 per hundredweight. Upon 862,000 pounds this would have been a gross loss of $17,240. The cost of marketing the court found to be $1 per hundredweight or $8,-620, which deducted from $17,240 leaves $8,-620. The court found that the cost of harvesting, watering, and cultivating said cabbage was $2,026.67, which, deducted from $8,620, leaves the *net loss* to appellee upon these 80 acres of cabbage $6,593.33. In so far as the above-named assignments relate to the damage to the 80 acres of cabbage, they are sustained; the judgment of the court in favor of appellee in the sum of $12,000 is set aside and will be here rendered for the proper amount. This also disposes of assignments 85a and 170.

[24] As to the cucumbers, the court found the following fact: "The court finds that in 1909 plaintiff marketed from its five acres of cucumbers which were not damaged by reason of lack of water, 2,328 hampers, or a little over 450 hampers per acre. These were late cucumbers and reached the market at a time when the markets were flooded, and they brought a very low price. Including losses on some shipments, the average price was 15 cents per hamper. The ten acres of cucumbers on account of which the damages are claimed in the suit were other and different patches of earlier planting, and would have brought the average price of $1.50 per hamper, heretofore found. The price realized by plaintiff from its first cucumbers marketed was $2.30 per hamper." The evidence upon this matter is in conflict, and the court could properly reach the conclusion that the loss on the cucumbers arose from the fact that the crop planted for the early market, and which would have brought the top price for the season, was damaged by appellant's failure to supply water. If the court proceeded upon this theory, which, from his conclusions of fact, he evidently entertained, the appellant cannot complain that the average price of the whole season was taken to establish the measure of damages, because no measure more favorable to it could have been adopted. Therefore the above assignments of error, in so far as they relate to the damage to the cucumbers, are overruled.

[25] Assignments of error 134, 135, 137, and 138 relate to the admission of evidence in reference to the market value of cabbage and cucumbers. They are overruled. If there was error, it was immaterial. The

trial was before the court, and there is other evidence in the record from which the court could have reached those of his conclusions sustained by this court, and therefore no damage could result to appellant.

[26, 27] Appellant complains that Roy Campbell was permitted to testify, over its objection, that of the cabbage and cucumbers some were sold at Mercedes and some were shipped to the market, but that all were sold on a basis of f. o. b. at Lawrence Spur (Mercedes). It is also complained that he was permitted to say that there was a market at Mercedes for cabbage loaded on the cars at Lawrence Spur, upon the ground that the statement was a conclusion of the witness. We see no vice in these actions of the court. The proper measure of damages was the price at the nearest market. If there was a market at Mercedes, that was the nearest; if there was not a market there, then evidence of the value at other proven markets was admissible. We do not think the evidence of Campbell complained of was open to the objection that it was a conclusion. Whether there is a market for produce at a given place is a question that can be answered yes or no. The means of the witness' knowledge can be tested in the proper manner, but it goes only to the weight of the evidence. Campbell had qualified as an expert on the value of truck and vegetables. The same can be said as to appellant's objection to the testimony of T. M. Lawrence and Theo. Lawrence, Jr. This disposes of assignments of error 136, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, and 154, all of which are overruled.

[28] Appellant's ninety-first assignment of error assails the court's fourteenth finding of fact, wherein it is said that 738,324 pounds of cabbage were raised upon the 80 acres of land, upon the ground that said finding is not supported by any *competent* evidence. The principal contention of appellant is that it was error to admit the evidence of Roy Campbell, T. M. Lawrence, and Theo. Lawrence, Jr., upon this issue, because they were able to testify only after refreshing their memories by reference to written data, such as bills of lading, manifest, etc. It is well settled that a witness, when testifying in reference to details involving dates, numbers, weights, or quantities, can refresh his memory from written data made by him or under his direction and within his knowledge. When it is remembered that these transactions covered several months and scores of shipments, this rule becomes specially applicable. It is not within the power of any normal man to carry in his memory the details of a business extending over several months and involving thousands of details such as were naturally involved in such business as was conducted in the transactions leading up to this case, and, unless it clearly appeared to the court that the data from which the witness refreshed his memory was not such as the law tolerates for that purpose, the evidence was admissible. We have examined the assignments raising the question of the sufficiency of these memoranda and believe the court committed no error in permitting the witnesses to testify after so refreshing their memory. In giving his evidence Theo. Lawrence refreshed his memory from manifests made at the time of the shipments from the weight book prepared by him. He retained a carbon copy of these manifests; they were the data by which the railway checked the shipment, and he swore that he knew they were correct. The mind of Roy Campbell, in giving his testimony, was refreshed from bills of lading and manifests passing through his hands as selling agent upon which the railroads transported the goods and upon which the consignees received them.

[29] These manifests and bills of lading and letters and telegrams were also admitted in evidence, and appellant assigns that as error. If this was error, it was harmless because the testimony of Campbell and Lawrence upon the same subject was sufficient basis for the court's findings upon the subject, and the written evidence could be rejected without changing the result. No error, therefore, is presented by assignments 91, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 127a, 129, and 130, and they are overruled.

Assignments of error 91a, 156, 157, 158, 159, 132, 155, 160, 161, 162, 163, and 164 are overruled. They relate to the findings of fact and the admission of evidence of A. M. White, T. M. Lawrence, Theo. Lawrence, Jr., and E. C. Green concerning what the probable yield of cabbage and other crops would have been if the appellee had been supplied with water for irrigation at the proper times after demand therefor. We will not detail the evidence, which is very extended, nor the qualification shown by the witnesses, but will say that they were all properly qualified as experts upon the questions.

The 169th assignment of error complains of the court's finding upon the care and diligence exercised by appellee in preparing its laterals and in watering and cultivating its lands. The court's language is perhaps a trifle too enthusiastic upon this subject, but the evidence sustains the essential parts of the conclusions and they cannot be disturbed.

[30] In assignments of error Nos. 101 to 109, inclusive, appellant insists that it was "not liable for damages for failure to furnish water to irrigate appellee's crops; the cause of such failure being the insufficiency of water from the Rio Grande, caused by drought or other causes beyond the control of appellant." Upon this subject the court found as follows:

"The Rio Grande river was at a very low stage throughout the spring of 1908, reach-

ing its lowest point on May 1st of that year. The lowest stage reached at this time was lower than the Rio Grande river had ever been known to be. The Rio Grande is a periodical stream. The largest volume of water comes down the river in the months of August, September, and October, after which the river usually steadily declines in volume until some time in April or May, when the melting snow on the mountains causes a considerable rise. This annual decline is annually expected and is very constant. From 1905 to 1909 the river has steadily each year reached a lower level; the lowest levels in April of each year being almost uniformly two feet below the level of the year preceding. But in 1902, the water in the river was at the lowest stage known up to that time, and lower than ever since, except probably in 1909. The pumping efficiency of defendant's pumps on account of the great lift required at low water diminished 50 per cent. from high water in 1908 to lowest water in May, 1909. At the low stages of water, the mineral matter in solution, which causes scale in the boilers when the water is used for boiler purposes, is about twice as great as in periods of high water.

"From December 1, 1908, until the May rise of 1909, defendant company had a great deal of trouble in filling its canals with water, on which account the two 250 horse power boilers at its power station were operated day and night, whereby the incrustation of scale in the boilers was greatly increased and said boilers had to be put out of commission very frequently in order to remove the scale. When one boiler was being cleaned, the other boiler was sometimes used to operate one of the pumps at the river, but frequently both pumps were idle. In regard to the formation of scale, I find that the presence and approximate amount of scale-forming material in the water of the Rio Grande was known to the defendant company by means of chemical analysis in the year 1906, and that it had other analysis made in August, 1908. The pumps were operated from March, 1908, to August, 1908, by contractors, and the defendant had actual knowledge that great trouble was being experienced from scale, but believed that same could be efficiently handled by means of boiler compounds of lime and soda ash used in the feed water. From August, 1908, down to July, 1909, it attempted to keep down scale by this means. In July, 1909, it installed a purifier whereby the Rio Grande water was treated with lime and soda ash causing the mineral matter to be deposited before the water entered the boilers and not afterwards, as had previously been done. That such purifier was not ordered until February, 1909, although this method of treating the water was known to the engineer in chief and to the president of the corporation for many years, and they also knew that such purifiers had for many years been manufactured and were being sold. Other pumping plants in the Rio Grande Valley were able to operate and furnish all needed water, and to use the Rio Grande river water in their boilers, at its lowest stages, without serious difficulty from scale; but they did not have to operate so continuously in order to keep the water from seeping through the canal banks and bottoms. Defendant's canal system was constructed mainly by taking earth from the center of the canal for the embankments, instead of taking same from barrow pits and leaving the naturally firm surface of the ground undisturbed, as had previously been, and has ever since been, the custom of all other canal companies and systems ever constructed in the Rio Grande Valley. On account of the sandy subsoil thus exposed and the greater depth of such canals, the seepage in defendant's canal system exhausted more than 75 per cent. of the water pumped until, in the course of time, the bottom and sides became tight by reason of the deposit of silt and the vast pressure of the water. This seepage, and not the delivery of water to the farmers, was the reason why defendant corporation had to operate its boilers continuously. As early as March, 1908, defendant knew by actual observation that the water in its main canal lost by seepage 36 inches in level in 24 hours. The east main canal, completed in the fall of 1908, was able to operate and furnish all needed water, still sandier.

"Notwithstanding these known facts, the defendant corporation did not install or order new pumps or machinery until the year 1909, and never attempted to use its reservoir of 365 acres for the purpose of storing water and filling its canals when its pumps were out of commission. I find: That the defendant corporation was negligent in not providing an adequate and sufficient system of pumps and machinery for pumping, and that by the use of ordinary care it could have known that the plant it had was inadequate for its purposes, both in its estimated capacity and in its method of installation. * * * The defendant company could, at nominal expense, have increased its facilities for furnishing water during the low period of the river in the spring of 1909, by cutting off portions of its canal system on which there were no water takers. There were 4½ miles of main canal in the north main canal, and 1 mile in the east main canal beyond the farthest water takers thereon. * * * No attempt was made to cut off unnecessary parts of the canal system during this period, save those made on the north main canal as aforesaid. * * * That it could, at reasonable expense and well within its means, have properly prepared its canal system, and could so have subsequently remedied the defects therein as to furnish water to all its customers, including plaintiff, when water was needed and demanded by them throughout the year 1909, without any lengthy or injurious inter-

mission of service; and that all of plaintiff's damages were due solely to such negligence of defendant."

The above conclusions of fact have support of evidence, and they are sustained. The question presented was whether the low water in the Rio Grande was the cause of the appellant's failure to provide water in accordance with its contract. The court's findings clearly show that such at least was not the sole cause, and the evidence amply reveals the negligence of appellant in the matters spoken of by the court. Appellant complains that the court found that its actions constituted gross negligence. As we view the case, the appellant cannot complain of that. The measure of its duty was ordinary care; and, if it was guilty of ordinary negligence, it was equally liable, as the greater degree necessarily includes the lesser. The said assignments are therefore overruled.

[31] Assignments Nos. 25, 26, and 27 are overruled. They find fault with the order of the court overruling appellant's plea in abatement. It is contended that appellee company transferred the cause of action to Campbell and Lawrence in July or August, 1909, before suit was filed. Appellant complains because the court refused to permit it to question F. E. Scobey, who it contends would have testified that he bought the stock of Campbell and Lawrence before that time, and that they were to have, as a part of their interest, the present cause of action, and also that in July he tried to sell the stock to other people. It is revealed by appellant's bill of exceptions reserving this point that Scobey testified that "in July or August he had made a bargain to buy" the stock, and that he had "offered some" of the stock for sale. To make a bargain to buy is not to buy, and that Scobey offered to sell "a part" of the stock is of no materiality in this connection, especially since it is admitted that he had always owned one-third of the stock.

That portion of the judgment of the lower court awarding to appellee the sum of $7,190 for damages resulting from appellant's failure to supply water to irrigate 25 acres of land so as to enable appellee to transplant its cabbage thereon and the sum of $6,280 damages to 10 acres of cucumbers by reason of appellant's failure to furnish water to irrigate the same during April, 1909, and also the sum of $6,593.33 of the $12,000 awarded to appellee as damages alleged to have resulted from failure of appellant to furnish water to irrigate 80 acres of cabbage during

April, 1909, making an aggregate of $20,063.33, is affirmed. The balance of the judgment is reversed and here rendered in favor of appellant. The costs of this appeal are adjudged against the appellee.

### On Motion for Rehearing.

Appellant contends that, in this opinion, we are in conflict with Granger v. Kishi, 139 S. W. 1002. But the two cases are in no way inconsistent. On the contrary, in the Kishi Case the court stated the same doctrine as here announced, but concluded that the appellant had not constructed and was not "operating and maintaining an irrigation plant under the provisions of chapter 2, tit. 60, R. S. 1895." The court said: "For aught that appears, Kishi is simply the owner of an irrigation canal with a lateral running through and maintained on appellant's land with appellant's consent, and that he agreed to furnish appellant sufficient water to irrigate his rice crop, but providing, in effect, that if he failed to do so, and damages should accrue to appellant by reason of such failure, the appellee's liability therefor should not exceed $4 per acre. We think that this contract cannot be distinguished from contracts between individuals where neither of the contracting parties is undertaking the discharge of a public duty."

[32] Appellant calls our attention to the fact that we did not expressly dispose of its fifty-fifth assignment of error in the original opinion. It is perfectly clear, as contended by appellant, that the statute gives the water company the right to make contracts with water consumers, and that the rights of landowners who have no contract are subordinate to the rights of those who have. The statute recognizes the fact that the water available may be limited, and it does not require of the water company the impossible duty of supplying all applicants without reference to whether adequate water is available. The law even contemplates a scarcity of water and provides for prorating same among contract holders. But all this is immaterial in this case, as it is not contended that appellant's failure to furnish appellee with water arose from the fact that other consumers holding contracts used the whole supply.

Appellee also has presented motion for rehearing, but we find no merit in its contention.

The motions of both the appellant and appellee are overruled.