PLANTERS' COTTON OIL CO. v. GUARANTY STATE BANK OF MERTENS. (No. 1592.)

(Court of Civil Appeals of Texas. Texarkana. June 1, 1916.)

1. CORPORATIONS ☞374—CHARTER POWERS—CONSTRUCTION.

A corporation for the "manufacture of cotton seed oil and cotton seed products and the ginning of cotton, with power to purchase, or construct and maintain mills and gins for such purpose, and with power to purchase such goods, wares, and merchandise used for such business," is not empowered to buy and sell baled cotton for speculation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1517, 1518; Dec. Dig. ☞374.]

2. CORPORATIONS ☞374—IMPLIED POWERS.

Implied or incidental powers of a private corporation include those usually and customarily attending the business for which it is organized, and those necessary to enable it to fully perform the undertaking designated in the charter.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1517, 1518; Dec. Dig. ☞374.]

3. CORPORATIONS ☞374—IMPLIED POWERS—REMOTE BENEFIT.

Although by buying and selling baled cotton, a corporation might benefit itself by enlarging the local cotton market, such is not an implied power of the corporation organized to manufacture cotton seed products; the promotion of its business by such method being too remote.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1517, 1518; Dec. Dig. ☞374.]

4. CORPORATIONS ☞374—IMPLIED POWERS—REMOTE BENEFIT—SPECULATION.

Under Rev. Civ. St. art. 1164, providing that no corporation shall use its assets for any purpose other than to accomplish the legitimate objects of its creation or those authorized by law, a corporation for manufacture of cotton seed products cannot speculate in cotton, that being a hazardous business.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1517, 1518; Dec. Dig. ☞374.]

5. CORPORATIONS ☞413—LIABILITY FOR ACTS OF AGENTS—CONSTRUCTIVE NOTICE.

Without actual authority, the general agent of a corporation cannot by contract bind the corporation for money borrowed and used for a purpose outside the charter powers; one who deals with a corporation being charged with notice of limitations of powers by charter.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1647-1649; Dec. Dig. ☞413.]

6. CORPORATIONS ☞413—LIABILITY FOR ACTS OF AGENTS—CONSTRUCTIVE NOTICE.

If a corporation agent duly authorized to borrow money on its credit does so and uses it

for a purpose outside the charter powers, the corporation is liable by estoppel, since it cannot avoid liability on the ground of its own wrongful misappropriation of the money.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1647–1649; Dec. Dig. ⬦413.]

7. CORPORATIONS ⬦432(1) — LIABILITY FOR ACTS OF AGENTS—CONSTRUCTIVE NOTICE— BURDEN OF PROOF.

One who lends money on corporation credit to its agent has the burden of proving that the agent was authorized to borrow for the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1718, 1726, 1743, 1762; Dec. Dig. ⬦432(1).]

8. CORPORATIONS ⬦425(6) — LIABILITY FOR ACTS OF AGENTS — CONSTRUCTIVE NOTICE — EVIDENCE.

Since the general manager could not himself bind the corporation by borrowing money for a purpose outside the charter powers, his authorization of an agent by acquiescence in so borrowing does not estop the corporation to deny liability; the authority to manage the corporation under Rev. Civ. St. art. 1159, being fixed in, and nondelegable by, the directors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1705; Dec. Dig. ⬦425(6).]

9. CORPORATIONS ⬦426(10) — LIABILITY FOR ACTS OF AGENTS — ESTOPPEL — ACCEPTANCE OF BENEFITS.

The doctrine that a corporation, having accepted benefits of an unauthorized act of its agent, is estopped to deny consequent obligations, has no application where no benefits, but only liabilities, resulted.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1702, 1704, 1714; Dec. Dig. ⬦426(10).]

10. PRINCIPAL AND AGENT ⬦155(1)—POWER TO BORROW MONEY—RATIFICATION.

Unauthorized lending of money to an agent for use of the principal is not a lending to the principal, unless ratified by him, or unless the money is used in promoting business the agent is authorized to conduct.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 574, 578; Dec. Dig. ⬦155(1).]

11. CORPORATIONS ⬦427 — LIABILITY FOR ACTS OF AGENTS — ESTOPPEL — ACCEPTANCE OF BENEFITS.

In order to be relieved of the obligations arising from unauthorized acts of its agent, the corporation must return what it has received therefrom.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1745–1747; Dec. Dig. ⬦427.]

12. CORPORATIONS ⬦427 — LIABILITY FOR ACTS OF AGENTS — ESTOPPEL — ACCEPTANCE OF BENEFITS.

Where a corporation pays a debt under the impression, that it was contracted in due course of business by its agent, when in fact it was for money borrowed for a purpose beyond the charter powers, it can recover the amount so paid.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1745–1747; Dec. Dig. ⬦427.]

13. CORPORATIONS ⬦414(1) — ULTRA VIRES ACTS OF AGENTS—LIABILITY—NOTICE.

Where a corporation agent is authorized to draw checks and create an overdraft in the due course of business, but without notice to the bank, he draws such a check for a purpose outside the charter powers, the bank can recover the amount from the corporation, since the agent's act was in the apparent scope of his authority.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1640; Dec. Dig. ⬦414(1).]

Appeal from District Court, Hill County; Horton B. Porter, Judge.

Action by the Planters' Cotton Oil Company against the Guaranty State Bank of Mertens, wherein defendant filed a cross-bill. Judgment against plaintiff in the original action, and for defendant on its cross-bill, and plaintiff appeals. Judgment reformed.

Wear & Frazier, of Hillsboro, for appellant. R. M. Vaughan, of Hillsboro, P. W. Robertson, of Miami, and J. D. Abney, of Hillsboro, for appellee.

HODGES, J. The appellant is a private corporation, organized under the laws of Texas to engage in the operation of an oil mill and cotton gins, with its principal office at Frost, in Navarro county, Tex. In connection with its oil mill located at Frost the appellant owned and operated a cotton gin located at Mertens, Tex., only a few miles distance from Frost. This gin plant was commonly known as the "Planters' Gin Company," and was from some time in 1906 to March, 1914, under the management and control of an agent, Joe R. Read. From 1903 till about the first of the year 1913, G. L. White was the appellant's president and general manager, and appears to have been given by the board of directors general supervision of the affairs of the company. As such manager he had the supervision of the appellant's gin plant at Mertens, and hired the local manager, and fixed his salary and the terms of his employment. In 1906 White employed Read to take charge of the gin plant at Mertens at a salary of $100 per month during the business season, which extended over six months of each year. This contract appears to have been renewed annually without any express agreement. Read was given the general authority to supervise the Planters' Gin, including power to hire and discharge subordinate employés, make repairs, buy cotton seed, pay off the employés, and make the necessary financial arrangements with banks for the money required in carrying on the business of operating the gin. It also appears that White while manager permitted Read to purchase for the gin company cotton in the seed, and, to a limited amount, lint cotton in bales. However, it is not shown that any definite limits had been fixed to the amount of cotton which Read might purchase. In the spring of 1913 White and his associates, who owned 51 per cent. of the stock in the appellant company, sold their interest to John R. Griffin and his associates. Griffin then succeeded White as president and general manager. Read was soon thereafter employed by Griffin for the season beginning in the sum-

mer or fall of 1913, apparently upon the same terms embraced in his contracts with White. It does not appear that there was at that time any understanding between Read and Griffin that Read should carry on the business of buying cotton, as had been done under the management of White. There is no satisfactory evidence that Griffin then knew that Read had theretofore purchased cotton in bales for the account of the appellant and as an incident to the business of operating the gin plant. The evidence shows that for several years it had been the custom of Read, as the local manager of the gin plant, to carry accounts in the name of the Planters' Gin Company with one of the local banks of Mertens, and to borrow money on the credit of the appellant when needed to pay the current expenses of operation, in making repairs, and also for purchasing cotton in the seed and in bales. His accounts were divided into what he calls the "overdraft account" and a "bill of acceptance account," which were kept separate on the books of the bank. The overdraft account represented money advanced Read on checks drawn by him to pay for the purchase of cotton seed and the general expenses of operating the plant, including his salary and the wages of other employés. The "bill of acceptance" account represented money advanced to Read by the bank to pay for cotton purchased by him for the Planters' Gin Company. The dealings with reference to that account were explained as follows: When Read bought one or more bales of cotton a draft was drawn by the seller on the Planters' Gin Company for the agreed price, in favor of the local bank, and the weigher's certificate was attached. Upon the margin of the printed draft Read would write his name under the printed word "accepted." The bank would then cash the draft for the seller of the cotton, and enter the transaction upon its books in proper form. When the cotton was sold the proceeds were applied as a credit on that account. The appellee bank was organized as a state banking institution a year or two before Griffin became appellant's manager, and R. O. Hooks was its cashier in the active management of its affairs. J. R. Read was one of the stockholders; and immediately upon the organization of the bank he opened with it accounts for himself and the gin company, which he represented. In August, 1913, Read began to buy for account of the appellant in the name of the Planters' Gin Company lint cotton in bales, which was paid for by the appellee bank under a special arrangement for cashing drafts accepted by Read in the manner above described. Between that date and some time in the early part of January following the aggregate amount of money advanced by the appellee to Read for the purchase of cotton, including interest and some other small charges, was $40,552.11. Nearly all of this cotton purchased was in bales,

only a few purchases being in the seed. The aggregate amount realized from the sale of the cotton thus purchased amounted to $36,901.20, which was applied as a credit on this account, leaving a balance due appellee of $3,650.91. This balance remained upon the appellee's books as a charge against the appellant, and is one of the items sued for by the bank. In November, 1913, before all of the cotton was disposed of, the price of cotton having depreciated, Hooks, the cashier of the appellee bank, demanded of Read that he place to the credit of the "bill of acceptance" account the sum of $1,000. In order to secure the money for that purpose Read drew a draft in favor of the appellee against the appellant for that sum. This draft was afterwards collected by the appellee, after passing through the usual commercial channels, and the proceeds applied as a credit on the "bill of acceptance" account. During the same month, 1913, Read drew a check on the appellee bank in favor of M. W. Lovell for the sum of $400, which was paid and charged to the appellant's "overdraft" account. There is some conflict in the evidence as to the nature of the debt for the payment of which this check was drawn. About the close of the ginning season in 1914 the books of the appellee bank showed a balance due from the Planters' Gin Company on the "overdraft" account of $606.30, and $3,650.91 due on the "bill of acceptance" account, the latter for money which had been advanced to pay for the purchase of cotton. Payment of the last-mentioned sum was demanded of Read, who referred the matter to Griffin. Griffin claims that this was the first intimation he had that Read had been engaged in buying and selling cotton in bales. This led to an inquiry by Griffin into the dealings of Read with the appellee bank, and a controversy arose as to whether or not the appellant was liable for the advances made to Read to enable him to buy cotton. Upon his request Griffin granted time to confer with his board of directors in order to determine whether or not payment should be made. Later it was decided by Griffin and his associates that they would not pay the sum demanded, but instead would claim reimbursement for money which had theretofore been paid out on the draft drawn by Read against the appellant for $1,000 and for the check of $400 which Read had given to Lovell. Accordingly this suit was instituted by the appellant against the appellee, seeking the recovery of those two items. It was alleged in substance that the draft for $1,000, drawn by Read in November, 1913, was paid by the appellant in ignorance of the purpose for which the money was to be used; that the proceeds of the draft were knowingly received and applied by the appellee either upon a claim it held against Read personally or upon an account against the appellant made by Read without authority and for which the appellant was not responsible.

Substantially the same averments were made relative to the $400 covered by the check given by Read to Lovell. The appellee answered by appropriate averments, putting in issue all the material facts upon which the appellant sought a recovery. It also in the form of a cross-action sought to recover the entire balance due from the appellant as disclosed by its books. The cross-bill sets out a history of Read's connection with the Planters' Gin Company and his dealings with the appellee in behalf of that company, and alleges that Read was fully authorized by the appellant to incur in its behalf the debts for which it sued. Supplemental pleadings were filed, in which the appellant alleged that the acts of Read in contracting for advances to enable him to deal in cotton were not only unauthorized by the appellant, but exceeded the powers granted in its charter. To this the appellee replied, alleging that the appellant had received the benefits of the contracts made for it by Read and was estopped from pleading a want of authority on the part of Read or that the contracts were ultra vires, and that it was also estopped by reason of the manner in which it had conducted itself in permitting Read to transact the business of buying and selling cotton. A trial before a jury resulted in a verdict in favor of the appellee against the appellant for the sum of $2,128.60, and also against the appellant on its demands in the original suit for $1,400.

[1, 2] The liability of the appellant for the debt claimed in this controversy and its right to recover the sum for which it sues depend upon the power of the agent, Joe R. Read, to bind the company in the contract he made in its name with the appellee bank. In view of the pleadings denying the existence of that power and the grounds upon which that denial is placed, it becomes necessary to examine the provisions of the charter under which the appellant was then doing business. The following portions of that charter were offered in evidence:

"(V) The government of this corporation shall be vested in a board of directors to consist of nine (9) members, and the following, all of whom reside at Frost, Navarro county, Texas, shall constitute such board for the first year of its corporate existence, to wit: J. F. Henderson, J. R. Slay, G. J. Heflin, J. A. Gillean, J. M. Scott, J. M. Sharp, H. P. Ross, S. S. Hooser and W. T. Bromley.

"(II) The object of this corporation and the purpose for which the same is organized, is the manufacture of cotton seed oil and cotton seed products and the ginning of cotton, with power to purchase or construct and maintain mills and gins for such purpose, and with power to purchase such goods, wares and merchandise used for such business."

In construing the corporate powers of the appellant the court gave the following as a part of his main charge:

"You are instructed that the original charter and amendments thereto of the Planters' Cotton Oil Company (which is the corporate name of the appellant) read in evidence before you confers on the Planters' Cotton Oil Company the power and authority to manufacture cotton seed oil, cotton seed products, the ginning of cotton, the power to purchase or construct and maintain mills and gins for such purpose, the power to purchase and sell such goods, wares and merchandise used for such business, and the power to engage in the purchase and sale of baled and seed cotton, and authority through a duly authorized agent to contract for loans of money with which to enable it to accomplish the legitimate object of its creation, or to be used in the transaction of its authorized business as hereinbefore stated; but does not confer on the Planters' Cotton Oil Company the power to sell cotton short and on consignment and holding baled cotton for speculation purposes."

This charge in effect told the jury that the business of buying and selling spot cotton for profit was within the charter powers of the appellant. In other portions of the charge the court instructed the jury that the appellant was liable for the money so advanced if Read in procuring the loan acted within the actual or the apparent scope of the powers conferred upon him by the corporation. The verdict of the jury was manifestly influenced by the construction which the court placed upon the charter powers of the appellant company, and induced the finding that Read acted at least within the apparent scope of his authority.

We have no hesitancy in holding that the construction placed by the court upon the appellant's charter is erroneous and led to an improper determination of the material issues of fact involved. The appellant was not organized for the purpose of becoming a trading corporation to buy and sell for profit, but a manufacturing concern. Its authority to purchase included the necessary machinery and equipment and such goods, wares, and merchandise as were to be used for its business—that is, for the business of producing cotton seed oil and the concomitant products from cotton seed, and the ginning of cotton in the seed. This enumeration would necessarily include cotton seed, and probably might be so extended as to include unginned cotton. The authority to purchase these articles was not only expressly given, but would be implied as incidental and essential to the lawful enjoyment of the franchise granted. But cotton which had already been separated from the seed constituted no part of the material upon which the corporation was to operate, and the handling of such an article could not directly, or incidentally, advance the purpose for which it was organized. In that state the article supplied neither cotton to be ginned, nor seed to be crushed. It seems to be conceded that the appellant's charter contained no express authority to embark in that particular line of business, but, it is contended, such authority was implied, inasmuch as it operated to enhance the appellant's main undertaking. In a general way it may be said that the implied or incidental powers of a private corporation include those things which usually and customarily attend the business for which the corporation is organ-

ized, and also that which is necessary to enable the corporation to fully perform the undertaking designated in the charter. Northside Ry. Co. v. Worthington, 88 Tex. 562, 30 S. W. 1055, 53 Am. St. Rep. 778; People v. Gas Co., 130 Ill. 268, 22 N. E. 798, 8 L. R. A. 497, 17 Am. St. Rep. 319; Nicollet National Bank v. Frisk-Turner Co., 71 Minn. 413, 74 N. W. 160, 70 Am. St. Rep. 334. See, also, Fidelity Trust Co. v. Louisville Gas Co., 118 Ky. 588, 81 S. W. 927, 111 Am. St. Rep. 302, and the numerous authorities cited in the notes appended. In the first case referred to above Chief Justice Gaines quotes as follows from Green's Bryce Ultra Vires:

"Whatever be a company's legitimate business, the company may foster it by all the usual means. But it may not go beyond this; it may not, under the pretext of fostering, entangle itself in proceedings with which it has no legitimate concern. In the next place, the courts have however, determined that such means shall be direct, not indirect; that is, that a company shall not enter into engagements as the rendering of assistance to other undertakings from which it anticipates a benefit to itself, not immediately, but mediately, by reaction, as it were, from the success of the operations thus encouraged—all such proceedings inevitably tending to breaches of duty on the part of directors, to abandonment of its peculiar objects on the part of the corporation."

Continuing, the court said:

"In short, if the means be such as are usually resorted to and a direct method of accomplishing the purpose of the incorporation, they are within its powers; if they be unusual and tend in an indirect manner only to promote its interest, they are held to be ultra vires."

There is nothing in the record on this appeal which justifies the conclusion that corporations like the appellant have usually engaged in the business of buying lint cotton for any purpose after it has been baled. Hence the implied power here claimed cannot be placed upon that ground.

[3, 4] The next question then is: Did the business of purchasing such cotton solely for the purpose of being sold again tend to promote or foster the business for which the appellant was organized? While the making of marginal profits in such dealings might enrich the corporation and its stockholders, such benefits would come from an independent enterprise, and not as a result of the manufacturing operations for which the appellant was chartered. But it is suggested that the appellant might lawfully engage in the business of buying lint cotton in order to establish a cotton market, through which medium its supply of cotton to be ginned would be materially increased. Clearly any undertaking which had that effect would tend to promote the appellant's main business; and if such was its direct and immediate results, the benefit might be such as to warrant the undertaking. While there is no satisfactory evidence that any such benefits accrued, either directly or remotely, by reason of the appellant's entering the market at Mertens, we may concede that

its operations as a cotton buyer did tend to enlarge the local demand for cotton, and in that way cause a larger supply to be brought to Mertens and placed upon the market, and through that channel ultimately increase the supply of seed cotton for appellant to gin, and seed to be crushed. Still, the benefits do not come within the rule quoted above. Buying and selling cotton in bales is usually classed and followed as a distinct occupation. The establishment and maintenance of cotton markets results from the pursuit of that business. It follows then that in order for the appellant to secure the increase in the supply of material to be used in its manufacturing operations it must invest a part of its capital in a separate and distinct enterprise, and in that way establish or enlarge the local market for an article which it did not use in its business, and thus indirectly or mediately secure the benefits sought. It appears to us that even if the suggested benefits followed they would be such remote consequences, and flow through such a circuitous channel, as to fall outside of the accepted rule. Moreover, the stockholders of private corporations have a right to object to the investment of their corporate funds in speculative and hazardous enterprises. It is a matter of common knowledge that the buying and selling of cotton is attended with great risks. The venture is one too perilous for the investment of trust funds by an agent without express authority from his principal. If there is any business from which a corporation chartered for other purposes should be forcibly separated, it is that of speculating on the cotton market. The record shows that in this instance about $40,000 was advanced to Read and charged to the Planters' Gin Company in what is called the "bill of acceptance" account, from some time in the early part of August to the close of the cotton season. If the appellant could buy and sell cotton so extensively as these advances indicate was done, it is difficult to fix any limit beyond which it might not go. Thus the way would be made easy for staking the entire credit of the corporation upon the fluctuations of the cotton market. It is the policy of our laws to confine private corporations to the particular franchise granted in their charter. Article 1164 of the Revised Civil Statute is as follows:

"No corporation, domestic or foreign, doing business in this state, shall employ or use its stock, means, assets or other property, directly or indirectly, for any other purpose whatever than to accomplish the legitimate objects of its creation or those permitted by law."

[5] If we are correct in saying that the buying and selling of cotton in bales, in a manner wholly disconnected with the enterprise specified in the appellant's charter, was beyond its corporate powers, it follows as a logical sequence that Read, the agent who carried on that business, could not without actual authority bind his principal in a con-

tract for money borrowed and used for that purpose. One who deals with a corporation is charged by law with notice of the limitations upon the powers granted in the charter by virtue of which it exists. First National Bank v. Kiefer Milling Co., 95 Ky. 97, 23 S. W. 675; Kraniger v. People's Building Society, 60 Minn. 94, 61 N. W. 904; 7 Ruling Case Law, § 515, and cases referred to in the notes. Those who deal with the agent of the corporation cannot assume that he has authority to do something which is extraordinary or unusual, or which exceeds the powers granted in the charter. Franco-Texan Land Co. v. McCormick, 85 Tex. 416, 23 S. W. 123, 34 Am. St. Rep. 815; American Rio Grande Loan & Irr. Co. v. Mercedes Co., 155 S. W. 286; Hayward Lumber Co. v. Cox, 104 S. W. 403. In the first case referred to above Chief Justice Stayton quotes approvingly the following language:

"A party dealing with an agent is not entitled to assume the existence of any extraordinary state of facts in order to bring the acts of the agent within the scope of his apparent authority. Hence, if an act performed by an agent of a corporation would be in excess of the company's charter, or the agent's authority, except under extraordinary circumstances, the company can be held bound by such act only provided these extraordinary circumstances did exist."

He then continues:

"If the power to be exercised be not clearly within the express or fairly within the implied powers given by the charter, nor within the grant of power, with its necessary incidents found in the appointment, nor within the apparent power of the agent, however that may be exhibited, but be a power which for its existence must invoke some extraordinary state of facts not of a nature to be known to the agent only, and clearly out of the usual course of business, then it would seem to be the duty of a person seeking to acquire rights through the exercise of the power to inquire as to its existence and as to the facts which bring it into being."

[6-8] It is true the appellant had authority under its charter to borrow money, and would be liable for its repayment, regardless of the purposes for which the money borrowed had been used. If Read in contracting with the appellee bank to cash the drafts drawn by him in payment of his cotton purchases had acted under competent authority from the corporation itself, there would be some reason for holding the corporation liable upon the ground of estoppel, even though the contract was ultra vires. For having the power to obtain loans, it could not defeat the demand for repayment by pleading that it had misappropriated the money or used it for an unauthorized purpose. But the appellee had the burden of proving Read's authority in this instance to make the contracts upon which it sues. Rector v. Mulford (Mo. App.) 185 S. W. 255. That burden could not be discharged by merely showing that the appellant's general manager had theretofore permitted or had authorized Read to enter upon that line of business. The manager himself could not assume that authority, and would therefore be powerless to confer it up-

on another. The authority of an agent to bind a private corporation in an ultra vires contract must come from the corporation itself—from the governing body, at least, if not from the stockholders—and not solely from some official whose powers are limited by the charter or by-laws of the concern. Lincoln Realty Co. v. Kentucky Title S. B. & T. Co., 169 Ky. 840, 185 S. W. 156; Franco-Texan Land Co. v. McCormick, 85 Tex. 416, 23 S. W. 123, 34 Am. St. Rep. 815. The power to manage the corporate affairs is placed by our statute in the board of directors. Article 1159, Rev. Civ. Stat. This authority is one which cannot be delegated to others. Tempel v. Dodge, 89 Tex. 69, 32 S. W. 514, 33 S. W. 222. An agent is never presumed to have authority to do something which is known to be beyond the power of his principal when his principal is a corporation of limited power. 4 Thompson on Corporations, § 4900. Hence the rule founded upon the apparent power of the agent has no application. In this case the evidence affirmatively shows not only that the appellant's board of directors never authorized the speculative enterprise engaged in by Read, but that, with the possible exception of the member who happened to be the manager at the time, none of them knew that Read was engaged in that business till demand was made for repayment by the bank. A meeting of the directors was then held and Read's contracts theretofore made with the bank were repudiated.

[9, 10] But it is contended that even if the contracts made by Read were ultra vires and also without any actual authority from the corporation itself, the appellant is nevertheless estopped to plead either of those defenses because it has received the benefits of those transactions. The rule of estoppel invoked in the above proposition has so frequently been applied in this state to contracts like the present, which do not violate any law, or public policy, that it is unnecessary to refer to authorities in support of it. The facts, however, do not make it applicable in this instance. The record shows that without consulting the appellant's general manager, or its board of directors, Read made the arrangements with the appellee's cashier, Hooks, by which the bank was to furnish him the money with which to pay for the cotton bought on the appellant's account during that cotton season. The account of these advances was kept on the books of the bank separate from all other charges made for money supplied to Read as the appellant's agent. As the cotton purchased was sold by Read the proceeds were presumably applied as a credit on this particular account; none of it being used for any other purpose. The balance here sued for is what remained after deducting all the credits from the cotton sales. From this it follows that the appellant did not

receive any benefit from Read's transaction with the appellee for which it should be required to account before repudiating his acts. As we have seen, such benefits as may have resulted from a stimulated market, even if there was any proof that these accrued, would be too remote to constitute an estoppel. The unauthorized lending of money to an agent for the use of his principal is not a lending to the principal unless ratified by the latter or unless the money is used in the promotion of the business which the agent is authorized to conduct. In short, an agent cannot embark upon an unauthorized enterprise, borrow money for that purpose on the credit of his principal, exhaust the money so borrowed in that enterprise, and estop the principal from repudiating his whole conduct solely upon the ground that the principal had been the beneficiary of the transaction. Gal., etc., Ry. Co. v. Allen, 42 Tex. Civ. App. 576, 94 S. W. 417. To hold otherwise would put it within the power of agents to bind their principal in every money-lending contract, regardless of the extent of the agent's transgression.

[11] The liability of corporations upon ultra vires contracts which have been executed by the other party rests wholly upon estoppel. In order to be relieved of the burden which it has voluntarily assumed, the offending corporation must restore what it has received. Corporations are merely required to be just and honorable in their dealings with others, and are not allowed to profit by their own transgressions. When not estopped upon some of the grounds recognized by law, they may plead the want of corporate authority in defense of contracts made by their agents. The reasons for granting this relief are thus stated by a high authority:

"(1) The interest of the public, that the corporation shall not transcend the powers granted. "(2) The interest of the stockholders, that the capital shall not be subjected to the risk of enterprises not contemplated by the charter and therefore not authorized by the stockholders in subscribing for the stock. "(3) The obligation of every one entering into a contract with the corporation to take notice of the legal limit of its powers." 7 Ruling Case Law, § 677, and cases there cited.

[12] We therefore conclude that the appellant was not bound by the contracts made by Read, and the judgment rendered against it is erroneous. It logically follows also that the appellant was entitled to recover back the sum of $1,000, which had been paid by it upon the draft drawn by Read in favor of the appellee, the proceeds of which were applied to a reduction of this unauthorized account. If the appellant could have resisted the collection of that sum upon the ground that it was an unauthorized debt, the bank after collection had no right to retain the money under the conditions attending its payment. The cashier of the appellee bank knew the purpose for which this draft was drawn, and that it was to be applied by him upon a debt for which the appellant was not liable. The appellant through its proper officers paid the draft in ignorance of the facts, doubtless assuming that Read, the agent, required that amount of money in the legitimate operation of the plant under his control. Interstate National Bank v. Claxton, 97 Tex. 569, 80 S. W. 604, 65 L. R. A. 820, 104 Am. St. Rep. 885.

[13] The appellant also sought in its petition a recovery for the item of $400 charged against it in the "overdraft account" upon the books of the bank. This was the amount paid to Lovell to cover margins on cotton held by a commission house. The evidence fails to show that the appellant has ever in fact paid that sum. It seems that at the institution of this suit that item was still carried on the "overdraft" account sued on by the appellee in its cross-action. The evidence shows that Read had authority to draw checks upon the appellee bank, even to the extent of creating an indebtedness against his principal, for money to be used in the operation of the gin plant. It was also shown that this particular check was paid by the bank without any notice that it was not for expenses incurred in the ordinary operation of the gin plant. The giving of the check was apparently within the scope of Read's authority. The appellee is therefore entitled to be protected by its lack of notice that he was actually transcending his power. See Interstate National Bank v. Claxton, supra; 4 Thompson on Corp. § 4930; also 5 Thompson on Corp. § 6041.

Upon the whole case we conclude that the appellant is entitled to recover of the appellee the sum of $1,000, less the sum of $606.-30 due upon the "overdraft" account in favor of the appellee after excluding the sum of $3,650.91 transferred thereto from the "bill of acceptance" account. This, by mathematical computation, will leave a balance due the appellant of $393.70, for which judgment will here be rendered. Except as indicated above, the appellee is entitled to no relief on its cross-action.

The judgment of the trial court will therefore be reformed accordingly, and the costs of this appeal adjudged against the appellee.